THE STATE ex inf. ATTORNEY-GENERAL v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS.

In Banc, June 2, 1904.

1. **RAILROADS: Competing Lines: Consolidation: Constitutional Inhibition: Terminal Railroads: Estoppel.** The words of the Missouri Constitution, prohibiting a railroad company from consolidating with another company which owns or controls a parallel or competing line, are sufficient to forbid the consolidation of lines tracking the State through its length or its breadth. They refer to railroad business in its ordinary meaning. But they do not inhibit the formation of a corporation to handle the traffic of all railroads approaching a city and to provide for them a common track for entrance to and egress from a union station and warehouses and factories. Nor do they forbid an arrangement by the railroads among themselves for the use of a common track or terminals.

*Held,* by **Gantt, J.,** dissenting, with whom **Robinson, C. J.,** and **Marshall, J.,** concur, that the words of the Constitution, to-wit, "No railroad or other corporation, or the lessees, pur-

chasers or managers of any railroad corporation, shall consolidate the stock, property or franchises of, or in any way control, any railroad corporation owning or having under its control a parallel or competing line," are words of exception, and can not be limited to trunk lines of railroads traversing the length and breadth of the State, but include terminal railroads in St. Louis having tracks connecting with railroads entering the city.

*Held*, also, that the various consolidating companies, having been organized under the general railroad law of the State and having accepted their charters as railroad companies, are estopped to deny that they are railroads within the meaning of the constitutional inhibition.

2. ———: ———: ———: ———: **Terminal Railroad.** The consolidation of several terminal railroads in St. Louis by the formation of one company owning them all, so that the cars of various railroads entering the city may be brought to a union station or to various warehouses over a common track or tracks, is not such a consolidation of railroads as is referred to by the clause of the Missouri Constitution which prohibits the consolidation of parallel or competing lines of railroad in this State. That clause does not apply to terminal facilities in a great city. [Gantt, J., Robinson, C. J., and Marshall, J., dissenting.]

3. ———: ———: **Competing or Parallel.** The clause of the Constitution forbidding the consolidation of "parallel or competing" lines of railroad was meant to prohibit the consolidation of competing lines whether they were parallel or not. The purpose was to preserve the competition. The word "parallel" does not necessarily mean lines geometrically parallel.

4. ———: ———: ———: **Competing and Parallel Lines: Bridges of Mississippi.** Unless the two terminal railroad companies which owned certain terminal tracks in St. Louis and separate bridges over the Mississippi river, each had tracks upon which they could receive cars from the same railroads on the east side of the river or had some connections by which either could have transferred the cars to railroads or warehouses or the union station on the west side, they were not owners of competing lines and therefore not forbidden to consolidate.

5. ———: ———: ———: **Information: Stating Conclusion: Demurrer.** A statement that the lines of railroad owned by two companies were competing lines is a statement of a conclusion, and the information in this case does not state the facts which show that the lines of railroad owned by the consolidating companies were competing lines at the time of their consolidation.

State ex inf. v. Terminal Railroad.

*Held*, by **Gantt, J.,** with whom **Robinson, C. J.,** and **Marshall, J.,** concur, that the information sufficiently avers that the lines of railroad owned by the consolidating companies were competing lines, and the defendant's demurrer thereto confesses as much.

6. **CORPORATIONS: Ultra Vires: Legislative Action: Province of Courts: Prospective Statute; Act of 1903.** The General Assembly is the source of corporate power, and it is the authority to declare the public power of the State. Until it speaks on the subject it is the province of the courts to declare whether a given act, such as the delegation of the corporate powers of one company to another or the consolidation of two companies, is contrary to public policy in the light of the common law, but after the lawmaking power has declared the public policy, the courts will enforce the policy as declared. And if the Legislature enacted a statute authorizing such consolidation or delegation of corporate powers, the courts, in an action brought by the State itself, will not interfere unless the statute is unconstitutional.

*Held*, by **Gantt, J.,** with whom **Robinson, C. J.,** and **Marshall, J.,** concur, first, that the act of 1903 did not authorize the consolidation of competing lines of railway, but simply the acquirement of convening lines, so as to make continuous lines of road; and, second, that act was only prospective in its terms, and could not authorize a consolidation made in 1893.

## Quo Warranto.

WRIT DENIED.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for informant.

(1)   In its popular sense, the term "railroad" includes all that are involved in the business of moving passengers and freight over a physical structure. Cent. Mo. Co. v. Railroad, 89 Fed. 560; Railroad v. Railroad, 46 N. J. L. 289; Railroad v. Railroad, 123 Ill. 594. The spirit and object of the constitutional inhibition must be regarded. It will not do to juggle with its technical meaning. Railroad v. Jarvis, 15 Am. & Eng. R. R. Cas. (N. S.) 459. The respondent, Terminal

Railroad Association of St. Louis, the St. Louis Merchants Bridge Terminal Railway company, the St. Louis Terminal Railway Company and the St. Louis Transfer Railway Company were organized under the general railroad corporation laws of Missouri and their articles of incorporation characterizes them as railroads. Ch. 12, art. 2, R. S. 1899. The manner of incorporation, and the nature and character of the business to be transacted, is shown by their articles of incorporation, and place them under the head of railroad companies doing a railroad business, to-wit: the transfer and carrying of freight and passengers upon physical structures. The constitutional inhibition in question was adopted for the protection of the people and the general welfare of the State. It must be construed to mean the same thing at all times and under all circumstances. It does not mean one thing at one time and another thing at a subsequent time. The framers of the Constitution, and the people who adopted it, must be understood to have employed the words used in their natural sense and to have intended a natural and reasonable construction and interpretation to be placed upon them. Gibbons v. Ogden, 9 Wheat. 1; Beardstown v. Virginia, 76 Ill. 34. It will be observed that there are no exceptions to the constitutional provision, and any corporation occupying the position of a public carrier and using facilities such as are ordinarily characterized as railroads, falls within the terms of this organic inhibition. Respondent is engaged in the business of a common carrier by moving passengers and freight over a physical structure suitable for the passage and conveyance of railroad cars from the lines of initial railroads over their own lines to and upon the roads of other companies. So far as the physical structure is concerned, it is identically the same as that of through trunk lines, employing and using the same facilities and the same means of transportation. It will not do, therefore, to say that the framers of the Constitution and the people who adopted

it did not intend that the provisions of this inhibiting section should apply to corporations conducting the business transacted by respondent. There is no rule of law and no principle sound in reason that authorizes such an exception. That there can be competition between such companies does not admit of doubt. Railroad v. Jarvis, supra. A consideration of the objects sought to be accomplished or the mischief designed to be guarded against is to be observed in determining the meaning of a constitutional provision. People v. Potter, 47 N. Y. 375; Baltimore v. City, 15 Md. 376; People v. Gies, 25 Mich. 83. Constitutions are instruments of a practical nature to be construed in the light of common sense, so as to carry out the intention of the framers and adopters. Railroad v. Brick Co., 85 Mo. 307; State ex rel. v. Laughlin, 75 Mo. 147. (2) The respondent, together with the St. Louis Merchants Bridge Terminal Railroad Company, the St. Louis Terminal Railway Company, and the St. Louis Transfer Railway Company, as such, are competing roads, and as such have no right to consolidate. The Terminal Railroad Association of St. Louis owns, in fact or under lease or contract, various lines of roadbed, side tracks and switches in various parts of the city of St. Louis. In this way it controls the traffic upon and over what is known as the Eads bridge. The lines of railroad formerly owned by the other companies above named traverse various parts of the city of St. Louis for terminal purposes. The St. Louis Merchants Bridge Terminal Railway Company, prior to respondent's obtaining control of it, operated and controlled the traffic, both passenger and freight, over the Merchants bridge at St. Louis. Both of the above-named bridges span the Mississippi river opposite the city of St. Louis. These bridges are natural competitors for the freight and passenger business across the Mississippi river and into the city of St. Louis. The terminal facilities of the St. Louis Merchants Bridge Terminal Railway Company

permeate various parts of the city, including the portion of the territory covered by the lines of the respondent. Both of these companies in their unfettered condition were rivals in business and were each doubtless making every effort possible to secure the switching and railroad transfer business in the respective localities where their lines were situated. Not only are the lines of roads of the respective companies parallel, as that term has been construed by the courts, but they are also competitive. Competitive, first, because parallel with each other; second, because they are engaged in that character of business which invites manufacturers, business men and corporations, warehousemen and others engaged in industrial enterprises to locate their establishments upon the line of switches and side tracks of the respective companies, or within a territory readily accessible thereto. In this way these companies, if free to act, were competitors with each other, by being able, of their own accord and without being bound by any agreement or understanding with its competitor, to make certain specific and reasonable concessions, contracts and agreements to industries of the character above mentioned. While these roads would not be parallel in a strict geometrical sense, yet there is no question but, in a decision of the courts on the subject, they would be considered as parallel and competing, because of their peculiar situation and the circumstances surrounding them. This principle applies to the case at hand, and in addition thereto, a large portion of the tracks of the several companies are parallel, one with the other, and as such are natural competitors in the business in which they are engaged. Pearsall v. Railroad, 3 Am. & Eng. R. R. Cas. (N. S.) 503, 161 U. S. 646; Railroad v. Ashling, 3 Am. & Eng. R. R. Cas. (N. S.) 549; State ex rel. v. Railroad, 11 Am. & Eng. R. R. Cas. 353; State v. Railroad, 24 Neb. 154, 8 Am. State Rep. 164; Railroad v. Railroad, 66 N. H. 100; Currier v. Railroad, 48 N.

H. 321; Railroad v. Jarvis, 15 Am. & Eng. R. R. Cas. (N. S.) 459; Cooley, Const. Lim., p. 240; Earle v. Railroad, 56 Fed. 909; Thomas v. Railroad, 101 U. S. 71. (3) The contract or agreement entered into on the seventeenth day of August, 1903, between respondent and the St. Louis Merchants Bridge Terminal Railway Company, is *ultra vires*. Railroad v. Railroad, 9 Hare 304; County v. Railroad, 50 Ind. 85; Abbott v. Railroad, 80 N. Y. 27; Gas Co. v. Light Co., 115 U. S. 650; Morrill v. Railroad, 55 N. H. 531; Railroad v. State, 72 Tex. 404; State v. Railroad, 24 Neb. 143; Pennsylvania Co. v. Railroad, 118 U. S. 316; Transportation Co. v. Palace Car Co., 139 U. S. 24. (4) Ownership of a majority of the stock of the St. Louis Merchants Bridge Terminal Railway Company by respondent is violative of the Constitution and statutes. Elkins v. Railroad, 36 N. J. Eq. 5; Railroad v. Collins, 40 Ga. 582; Railroad v. Commonwealth, 29 Am. & Eng. R. R. Cas. 145, 29 Am. & Eng. R. R. Cas. 154. (5) Legislatures can not authorize a contract or act of consolidation prohibited by the Constitution. Pearsall v. Railroad, 3 Am. & Eng. R. R. Cas. 503; State v. Vanderbilt, 37 Ohio St. 590; State v. Railroad, 8 Am. St. 164.

*M. F. Watts, H. S. Priest, Martin L. Clardy* and *W. M. Williams* for respondent.

VALLIANT, J.—This is a proceeding on information of the Attorney-General, the object of which is to exclude the respondent corporation from all corporate franchises, and to annul its charter, on the ground that it has violated the law of this State which prohibits a railroad company from consolidating with another company which owns or controls a parallel or competing line.

The information sets out in chronological order the several corporations that have been chartered to

handle the terminal railroad business in St. Louis. From its statements the following facts may be gathered:

In 1874 the structure now known as the Eads bridge across the Mississippi was finished. The railroad tracks over that bridge, extending from the east to the west, entered a tunnel under Washington avenue in St. Louis, which ran west and southwest until it emerged at a point near Eighth and Poplar streets. In that year a Union Depot Company was chartered, which erected a union depot and passenger station with switch tracks, yards, etc., at a point near Twelfth and Poplar streets. From that date on there were various companies chartered under the general railroad law whose object was to construct, maintain and use railroad tracks for the purpose of handling cars and trains of the various railroad companies coming into and out of the union depot from the south and the west, and also from the east over the Eads bridge. Through these corporations, rights-of-way were acquired, tracks and switch yards necessary for this business were constructed, connected with the tracks of the Union Depot Company extending from Compton avenue on the west to the properties of the Union Depot Company, thence east and through the tunnel and across the Eads bridge, by means of which trains of all railroads coming from the several directions above indicated were received by the agencies of the terminal company at the various termini of the railroads, and drawn into the premises of the union depot, and in like manner trains departing from the city were taken charge of at the union depot by the terminal company and drawn over its tracks and delivered to the railroad companies at their respective termini, and there were also constructed switch tracks and spurs reaching to private business establishments located in the vicinity, or along the general course, of the terminal tracks. The union depot and passenger station, and all its equipments, were subsequently moved

farther west, and now occupy blocks between Eighteenth and Twenty-first streets.

In 1889 the several corporations owning the terminal rights and properties above mentioned consolidated and took the name of the "Terminal Railroad Association of St. Louis," the original authorized capital stock of which was $7,000,000, which in 1893 was increased to $12,000,000 and in 1903 to $50,000,000. That consolidated corporation was organized under the general railroad law of this State. It is the respondent in this suit. The respondent thus became the owner of all the rights and properties above mentioned, including those of the Union Depot Company, all of which, in the language of the information, "constituted the larger part of the terminal, switching and car storage facilities subject to use by persons and corporations engaged in business in St. Louis and used by them in transferring and switching the products so dealt in or manufactured by them to and from the railroad tracks and lines of railroad companies running into, through and from said city and to and from the various factories, manufacturing establishments, freight depots, warehouses, private tracks and switches and other places in said city from the factories, storage warehouses, depots, railroad tracks and switches in said city to the place of distribution or delivery depot in said city, and in switching and conveying the freight and passenger cars from and to the switches, side tracks, depots, warehouses and termini of the various railroads running into said city." This condition continued until August 17, 1893, when the respondent, by agreement of that date with the St. Louis Merchants Bridge Terminal Railway Company, acquired control and practical ownership of the properties of that company. It is that agreement that forms the chief ground of the charge in the information that the respondent has violated the law.

The structure known as the Merchants Bridge is a railroad bridge spanning the Mississippi about two miles north of the Eads bridge, its west end being at Ferry street in St. Louis. The St. Louis Merchants Bridge Terminal Railway Company, which we will hereinafter call the Merchants Terminal, was incorporated under the general railroad law of this State in 1887. The object declared in its articles of association was to construct and maintain a standard gauge railroad within the limits of the city from the union depot to the northern city limits; and from a point where it crosses North Market southwardly to Carr Street; and from Ferry street eastwardly across the Merchants Bridge into the State of Illinois; also from the point where it crosses Pope avenue northwardly to the intersection of Morin and Florissant avenues—in all fifteen miles.

In 1892 the Merchants Terminal Company acquired from another corporation called the St. Louis Terminal Railway Company a line of railroad which was to be constructed from a point near the northern limits of the city running north and westward and then southwestward, belting the city to Arloe station in St. Louis county, which is a station on the St. Louis & San Francisco railroad. The design of this road was, when it should be completed, to furnish all persons and corporations in the city who might have use therefor "railroad connections, tracks, switches, freight cars, terminal and railroad terminal facilities including depots, warehouses, car storage therein, switching facilities, and railroad track and terminal connections with the various railroads running into the city." and in this respect the design was to compete with the respondent in doing that business.

On August 17, 1893, the respondent entered into an agreement, the particulars of which are set out in the information and a copy filed as an exhibit, the result of which was to give the respondent the practical ownership and control of the properties of the Merchants

Terminal Company and, with the other properties held by respondent, to give to respondent control of all instrumentalities now in operation in the city designed for handling the terminal business of the railroads centering in St. Louis.

The conclusion drawn by the Attorney-General from those facts is that the respondent, the Terminal Railroad Association of St. Louis, has violated the law as ordained in section 17 of article 12 of the Constitution of this State, and as declared in section 1062, Revised Statutes 1899.

The respondent demurs to the information, assigning as grounds therefor that the information does not show:

1.   That respondent's road and that of the Merchants Terminal are parallel or competing lines.

2.   That they are railroads within the meaning of section 17, article 12, of the Constitution, or of section 1062, Revised Statutes.

3.   It does show that the properties of the respondent are such as it was authorized to acquire and use by the provisions of sections 1164-1165, and the amendments thereof by the act of the General Assembly of 1903.

I.   The clause in the Constitution which it is contended has been violated is found in section 17, article 12, which section is as follows:

"No railroad or other corporation, or the lessees, purchasers or managers of any railroad corporation, shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control, any railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line.   The question whether railroads are

parallel or competing lines shall, when demanded, be decided by a jury, as in other civil issues.''

In 1875, when the convention which framed our Constitution was in session, there were already lines of railroads running through the State which were parallel and competing, not parallel in a strictly geometrical sense and not competing at all points, but parallel as that word had come to be used in a commercial sense as applied to railroads, and competing between principal termini for the business of carrying freight and passengers between those points. And it required then but little foresight to discern that other lines of railroads, in a like sense parallel and susceptible of being used in a like sense in competition, would be constructed crossing or traversing the State in all directions. The history of those times tells us that the people were already awakened to the advantage that competing roads would afford them and to the necessity of preserving that advantage. It was in view of the condition then existing and conditions then to be reasonably anticipated that the clause in the Constitution above quoted was adopted. Courts should not lose sight of those conditions when construing that clause. In the language of the Attorney-General it ''must be construed in the light of its practical, popular and general sense, with the view of protecting the public against adversities and injuries which would naturally follow in the absence of this inhibition.'' And we make free to quote from the Attorney-General again when he says: ''The spirit and object of the constitutional inhibition must be regarded; it will not do to juggle with its technical meaning.''

Going back to the date when the Constitutional Convention was in session and viewing the physical and commercial conditions as they were at that date we must conclude either that a system of terminal railroad appliances, such as the information shows has, since then, been evolved in St. Louis, had not then been conceived by the members of the Convention, or else that they did

not understand that they were affecting that class of public utilities when they adopted the clause now under consideration.   Because, if they had such traffic appurtenances in mind and if they intended to include them in the inhibition, they would have used words more apt to express such intention.   The words as used are sufficient to forbid a consolidation of railroad companies whose lines are parallel or competing in the sense above-mentioned, tracking the State through its length or its breadth; they need no other words of explanation to give them that effect, and that is the effect that we would naturally conclude the framers of the Constitution intended them to have.

We have a right to presume that a system of terminal railway appliances as a public utility was not altogether unknown to the members of the Constitutional Convention, though such a system was then in an undeveloped stage of existence, because, as early as 1871, the General Assembly had passed an act looking to the formation of such a system and, as the information shows, such a system was, in 1875, in a formative state in St. Louis.   The act of 1871, amended from time to time as to the General Assembly seemed necessary to meet the wonderful growth of the city and its railroad traffic, has been preserved in our statutes, and is now embodied in sections 1164, 1165, Revised Statutes 1899, and Laws 1903, p. 130.   The act of 1871 (Laws 1871, p. 59) starts out with a declaration of the advantage to be attained and the disadvantages to be overcome by its enactment: "In order to facilitate the public convenience and safety in the transmission of goods and passengers in large cities from one railroad to another, and to prevent the unnecessary expense, inconvenience and loss attending the accumulation of a number of stations," corporations to do the kind of traffic that the respondent is now engaged in doing were authorized to be formed.   Thus when the Convention was in session there were in the State  corporations engaged in carrying over their rail-

roads freight and passengers from one city to another, and other corporations engaged in transferring the cars brought by a railroad to its terminus in a city to some other point in the same city or to a common terminus of all railroad traffic in that city. The characters of the business of the two kinds of corporations were essentially different, though both related to railroad traffic. The one was railroad business in its ordinary meaning, the other railroad business of a special character. A law might naturally be designed with reference to the one without being intended to affect the other. The statute expressly authorizes the formation of a corporation to handle the traffic of all railroads approaching the city and, to that end, to use a common track, to that extent therefore merging all the railroads in one; and it also authorizes the railroad companies to make such a combination among themselves. There is to be found in the act of 1871 and its amendments express authority for railroad companies parallel and competing or otherwise to unite or, if the term is preferred, consolidate, after they reach the city, so as to throw all their terminal business under a joint management. Thus at the time the Constitutional Convention was in session there was a law expressly permitting railroad companies to consolidate their properties and interests to this extent, and there was in fact, according to the averments in the information, such a consolidation of interests, by railroad companies, in operation in this city; therefore, before we can say that the framers of the Constitution intended this section to apply to corporations engaged in strictly terminal business, or to railroad companies uniting in a common terminal system, we must say that they intended to forbid the formation of such a union terminal system as the statute had expressly authorized.

The history of the railroad terminal business as disclosed in the information and the acts of the General Assembly affecting the same, show that neither the men engaged in the business nor the members of the General

Assembly from first to last have ever put such an interpretation on the Constitution.

The main purpose in the minds of the members of the convention in adopting this section was to preserve to the people who might have a choice of railroads between two points, the advantage in rates that would accrue to them from competition between rival companies. We must not lose sight of that purpose in our consideration of this subject.

The purpose of the statute of 1871 and its amendments as proclaimed in its preamble and as shown by its provisions, is to obviate the necessity of every railroad having its own passenger station, freight depot and switch yard, involving the expense and inconvenience of moving passengers by means of omnibuses, and other such vehicles, to other stations in the city, and the unloading and hauling of freight from the terminus of one road to that of another or to the consignee's place of business in the city or from the manufactory to the railroad terminus, all of which as appears in the now almost forgotten history of railroad traffic in the past, was accomplished at the great inconvenience and expense of the passenger and the shipper.

The purpose of the General Assembly was to allow such combination among the managers of the railroads entering the city as to reduce to the minimum the number of tracks, bring all the trains to one terminus, all freight to a common point for distribution, all cars to a common yard. It expressly authorized two or more railroad companies to do this and it put no limit to the number that might so combine.

The railroad companies in this State have for thirty years past been acting on the theory that they had the right to do that and so they have unless we can say that the framers of the Constitution intended to forbid them doing so.

The purpose of the statute is not only not in conflict with the purposes of the Constitution but is in aid

of it.  We have between our two greatest cities, St.
Louis and Kansas City, four or five railroads which in
the sense above mentioned are parallel and competing
lines for the traffic between those two cities.  Suppose
a manufacturing concern in the northern part of the city
has a switch track to its establishment connecting it with
the Merchants Terminal tracks and desires to make ship-
ments of its products to Kansas City, the business of the
concern being of such magnitude as to make its patronage
an object of rivalry between all the railroad companies
reaching that market.  But if the Merchants Terminal
Company can deliver the cars which are loaded on the
switch at the manufacturer's establishment to one rail-
road only that railroad has a practical monopoly of the
business of that manufacturer.  But if the whole ter-
minal system is open to the shipper he may invite bids on
his freight and employ the railroad that will take it
at the lowest rate.  That is the system that this respond-
ent has established, and it is bound to serve all railroad
companies approaching St. Louis on the same terms; in
the language of the information "the general object and
purpose being to provide the most ample and convenient
connections, accommodations and terminal facilities in
St. Louis for all railroads now entering, or hereafter to
enter the same, and all individuals and companies doing
business with said railroads."  The State has ample
power to hold the respondent to a faithful performance
of that public duty, to prevent favoritism and to prevent
extortion.

We gather from the information that all along the
lines of the terminal tracks, intersecting the city from
north to south, from east to west, and belting it on the
west, there are manufacturing and other business con-
cerns with switch tracks or spurs into their premises,
which enable the shipper to load the cars on the switch
tracks on his premises and have them delivered to any
railroad that reaches the city.  A more effectual means
of keeping competition up to the highest point between

parallel or competing lines could not be devised. The destruction of the system would result in compelling the shipper to employ the railroad with which he has switch connection, or else cart his product to a distant part of the city, at a cost possibly as great as the railroad tariff.

St. Louis is a city of great magnitude in the extent of its area, its population, and its manufacturing and other business. A very large number of trunk line railroads converge in this city. In the brief of one of the well-informed counsel in this case it is said that St. Louis is one of the largest railroad centers in the world. Suppose it were required of every railroad company to effect its entrance to the city as best it could and establish its own terminal facilities, we would have a large number of passenger stations, freight depots and switch yards scattered all over the vast area and innumerable vehicles employed in hauling passengers and freight to and from those stations and depots. Or suppose it became necessary in the exigency of commerce that all incoming trains should reach a common focus, but every railroad company provide its own track; then not only would the expense of obtaining the necessary rights of way be so enormous as to amount to the exclusion of all but a few of the strongest roads, but, if it could be accomplished, the city would be cut to pieces with the many lines of railroad intersecting it in every direction, and thus the greatest agency of commerce would become the greatest burden.

This is what our General Assembly as early as 1871 to some extent at least foresaw and attempted to relieve against, and we can not believe that the Constitutional Convention in 1875 was less appreciative of the conditions then present or in prospect, and hence we can not believe that the Convention, when it said that two lines of railroads that were parallel or competing should not be brought under one ownership or management, meant that two lines, used exclusively for bringing the trains from the several railroad termini in the city or at the

city's border to a common terminus, should not be so consolidated; because, as we have seen, the consolidation of the terminal facilities promotes the competition that this clause in the Constitution was designed to preserve.

What we have above said is intended to apply to the respondent only in reference to the charge in the information that it has violated the clause of the Constitution forbidding the consolidation of railroad companies whose lines are parallel or competing. We hold that that constitutional inhibition was not intended to apply to companies owning lines of railroads used alone in terminal business.

II.   The information charges that the roads owned by the respondent in 1893 and those owned by the Merchants Terminal Company were parallel or competing lines. That is the statement of a conclusion which depends for its correctness on the facts from which it is drawn. The words in the Constitution descriptive of the lines are "parallel or competing." The conjunction "or" is there used to co-ordinate the two words which it connects, as equivalent, the one of the other. The lawmakers were concerned, not so much with the figure the lines of the roads would make when traced on the map, as they were with the commercial relation the lines bore to each other; the desideratum was to preserve the competition.

The two railroad bridges crossing the river are parallel; whether they could have been used in 1893 by their respective owners in competition with each other, depends on the facilities that each had for receiving and delivering trains from the various railroads approaching St. Louis from the east aimed for the union station or trains departing from the union station destined to the east.

The information gives us to understand that the respondent company was, already in 1893, before it acquired the right to use the Merchants Terminal tracks, equipped to do that business, and it specifies the lines

of railroad and appurtenances that constituted that equipment, but it does not show that the Merchants Terminal Company was equipped to do a like business. In that important particular this case differs from Railroad v. Jarvis, 15 Am. and Eng. R. R. Cases (N. S.) 459, to which we are referred. In that case there were two belt lines which crossed and tapped all the railroads north of Cahokia Creek terminating in East St. Louis, and the two companies were in fact actively engaged in competing with each other for the same business. The court said: "It appears that in 1884 these two companies were cutting rates, buying business, and losing money, and upon the advice of a mutual friend . . . the two companies concluded to put the two properties under the same management and as a result the leases in question were made." No such condition is shown in the case at bar.

In paragraph 26 of the information the lines of road owned and operated by the respondent at the date of the organization of the Merchants Terminal and thence down to the date of the agreement of consolidation complained of, are given, but in the next paragraph when the lines of the Merchants Terminal are given the present tense only is used. These lines are described as commencing at the Merchants Bridge, thence going southwardly, crossing certain streets and blocks described by name and number until it crosses block 419 and Eighth street; the description of the course then given is in these indefinite words, "thence westerly to the present union station." Whether the Merchants Terminal Company before the contract complained of had independent connection with the union station, or whether trains coming over the Merchants Bridge could have been delivered in the premises of the union station, or trains destined for the east could have been taken thence over the route of the Merchants Terminal independent of the appliances of the respondent, the information does not say. It says the Merchants Terminal Company had

a perpetual lease of the Merchants Bridge, but what connections it had on the east bank of the river or what facilities it had for receiving and delivering trains on that side it does not say. It does not say that before or at the time of the contract assailed the Merchants Terminal was in actual competition with the respondent in the handling of trains, or that it had the means or equipment to compete with respondent for the business. The fact that connection is now made between the Merchants Terminal tracks and those of the union station do not justify the inference that such connections existed before the Merchants Terminal passed under the control of the respondent.

The Merchants Terminal could not have been a competing line unless it had such connection, and it could not have become a competing line unless it had the right and power of acquiring such connection. The essential facts to constitute the Merchants Terminal a competing line with that of the respondent are not stated in the information, at most they are left to inference, but since the information is aimed at the life of the respondent it must be construed *contra proferentem*.

The facts stated in the information do not justify the conclusion therein drawn that the Merchants Terminal was at the time of the consolidation complained of a competing line with the lines of the respondent.

III. It is argued that the contract of August 17, 1893, whereby the consolidation was effected, was *ultra vires* and that it was against public policy. This assails the validity of the act of consolidation on grounds independent of the constitutional provision above discussed.

The Attorney-General in his brief says: "And it has been time and again held that contracts made by and between quasi-public corporations, whereby the corporate powers and duties of the one are delegated to the other, and where an attempt is made to alien either absolutely or conditionally the franchises essential to the perform-

ance of its public duties, are *ultra vires* and absolutely void.'' And authorities are cited in the brief which support the proposition.

Of course a statute can not authorize the doing of an act which the Constitution forbids. Since, however, we have concluded that the consolidation complained of is not within the range of the constitutional inhibition we may now consider it in the light of the statute.

There is no controversy in this suit between individuals and the corporation; it is the State through its law officer that is here calling the corporation to the bar and demanding judgment of extinguishment of its corporate life on the ground that it has committed an act beyond its corporate power, and an act contrary to public policy.

It might be conceded without affecting the result, that in 1893 the respondent had not the corporate power to purchase the stock of the Merchants Terminal Company, but its act in that respect, even if *ultra vires,* was not for that reason necessarily against public policy. The effect of it was, according to the information, to put all the terminal railroad business under one management, but in so far as that concerned public policy it was in line with the policy declared in the preamble to the act of 1871 and repeated in every revision since that date. In 1903 sections 1164 and 1165 were amended expressly conferring on such terminal railroad companies the corporate power to acquire and hold the stock of other such companies. [Laws 1903, p. 130.]

The General Assembly is the source of corporate power and it is also the authority to declare the public policy of the State. Until the General Assembly has spoken on the subject, it is the province of the courts to judge whether or not a given act is contrary to public policy in the light of the common law, but after the lawmaking power has declared the public policy, the courts must enforce the policy as so declared.

If it be conceded that in 1893 the acquisition by the

respondent of the stock of the Merchants Terminal was against public policy, it is not so now because in 1903 the General Assembly expressly authorized it.

What right, therefore, has the State now to demand the annulment of the respondent's charter on the ground that it has done an act which it had no corporate power to do and which was then contrary to the public policy, when the State itself has since the act was done conferred on the respondent the right to do it and declared that it is in the interest of the public? In so far as it appears from the information, the State alone is interested in this matter, and since the State, before this information was filed, had expressly authorized the doing of the act in question, the court would not be justified in condemning the act as unlawful or against public policy.

The second count in the information relates to the acquiring by respondent of the property of the St. Louis Transfer Railway Company. What has already been said in reference to the first count applies with equal effect to this count.

The demurrer is sustained and ouster denied. *Brace, Burgess* and *Fox, JJ.,* concur; *Robinson, C. J., Gantt* and *Marshall, JJ.,* dissent.

DISSENTING OPINION.

GANTT, J.—Upon such consideration as I have been able to give it, I find myself unable to concur in the opinion of the court. The information alleges, and the demurrer of the Terminal Railroad Association admits, that it is a railroad company of the State of Missouri which has acquired the railroad properties of the "Terminal Railroad Company," "a railroad corporation organized for the purpose of constructing a standard gauge railroad from place to place on the eastern boundary line of the State of Missouri opposite the city of St. Louis where the present bridge known as the

Eads Bridge'' crosses the Mississippi river at the foot of Washington street in said city, thence from said place on the eastern boundary line of said State to a place near Poplar street and the western limits of the city so as to make suitable connections with the tracks of the Union Depot Company, the Missouri Pacific, the St. Louis, Iron Mountain & Southern Ry. Co., the St. Louis, Kansas City & Northern and other railroads having termini at said city, the length of said railroad to be as near as may be six miles. It is also averred and admitted that the Union Railway and Transit Company was a railroad company, organized under the laws of this State and that said railroad company and the Terminal Railroad of St. Louis were consolidated into one railroad company under the name and style of the Terminal Railroad Association of St. Louis, and that on the twenty-sixth day of July, 1889, said Terminal Railroad Association was in control of all the properties of the St. Louis or Eads Bridge Company, the Tunnel Railroad Company, the Union Depot Company and the Terminal Railroad of St. Louis and from that date operated said railroads and exercised every and all the rights, privileges and franchises to them belonging; all of which said property constituted the larger part of the terminal, switching, and car storage facilities, subject to use by persons and corporations engaged in business in St. Louis and used by them in transferring and switching the products so dealt in or manufactured by them to and from the railroad tracks and lines of railroad companies running to and from the various factories, manufacturing establishments, freight depots, warehouses, private tracks and switches and in switching and conveying freight and passenger cars from and to the switches, side tracks, depots, warehouses, and termini of the various railroads running into said city; that such conditions continued to exist until the construction of the railroad bridge known as the ''Merchants Bridge'' erected at the city of St. Louis for railroad purposes

across the Mississippi river, and from the foot of Ferry street in said city of St. Louis across to the State of Illinois by the St. Louis Merchants Bridge Company and the organization of the St. Louis Merchants Bridge Terminal Railway Company; that said Merchants Bridge is parallel to the said St. Louis or Eads Bridge and about two miles distant and north thereof. It is further averred that said St. Louis Merchants Bridge Terminal Railway Company was incorporated under the general law of this State at that time providing for the incorporation of railroad companies and known as article 2, chapter 21, Revised Statutes 1879; that said company was organized to construct, maintain and operate a standard gauge railroad within the corporate limits of St. Louis; that on the eighth day of May, 1893, the articles of incorporation of said last-named company were amended so as to authorize it to construct, maintain and operate its *standard gauge railroad* within the corporate limits of the city of St. Louis from union depot, then being constructed near Twentieth and Market streets in St. Louis, to the northern city limits of St. Louis near the Chain of Rocks, and from a point where the lines of said railroad cross North Market street southwardly to Carr street in said city, also from a point or points near where the line of said railway crosses Ferry street in said city eastwardly into the State of Illinois, and from a point at or near Bulwer street where the line of said railway crosses Pope avenue northwardly to a point at or near the intersection of Morin and Florissant avenues in said city, the length of said railway to be fifteen miles.

"It is further stated that on the second day of January, 1892, a contract and agreement was entered into between the St. Louis Terminal Railway Company as party of the first part and the St. Louis Merchants Bridge Terminal Railway Company as party of the second part, both of said parties being the corporations hereinbefore described, bearing the respective names

aforesaid. By the terms of said lease it is stated that the St. Louis Terminal Railway Company is the owner of a certain line of railroad in the State of Missouri, between the point of intersection of the tracks of the two respective companies to said lease, in the city of St. Louis, and the point of connection of the tracks of the said St. Louis Terminal Railway Company and the St. Louis and San Francisco Railway Company at a point near Arloe station, in the county of St. Louis. Said lease also states that the St. Louis Merchants Bridge Terminal Railway Company owns, controls, and operates a railroad extending from a point near the union depot in the city of St. Louis to and over the bridge across the Mississippi river to the State of Illinois, to a point in the State of Illinois opposite said city of St. Louis known as the Merchants Bridge, and thence from said Merchants Bridge to a point of connection of the tracks of both parties to said agreement at or near the intersection of Morin avenue and Florissant avenue in said city of St. Louis, at which last-named point the line of railroad owned, controlled, and operated by the said St. Louis Merchants Bridge Terminal Railway Company intersects, joins, and connects with the line of railroad of the St. Louis Terminal Railway Company.

"By the terms of said lease, and in consideration of the conveyance and the agreement therein contained and hereinafter mentioned, the St. Louis Terminal Railway Company leased, demised and let unto the said St. Louis Merchants Bridge Terminal Railway Company, its successors and assigns, free from all liens and encumbrances of every kind, excepting a certain mortgage in said lease described and hereinafter mentioned, for the full term of forty years from and after the second day of January, 1892, the line of railroad of the said St. Louis Terminal Railway Company as the same then existed or may at any future time be located, constructed, maintained or operated or acquired between the point of intersection of the tracks of the said parties at or near

the intersection of Morin avenue and Florissant avenue, in the city of St. Louis, to a point of connection of the railroad of the said St. Louis Terminal Railway Company with the St. Louis and San Francisco Railway near Arloe station aforesaid, and all the real estate, right of way, double tracks and crossovers in said line provided to be purchased and constructed, together with the right, privilege, and franchise of maintaining and operating said part of said railroad, and regulating, fixing, charging, collecting and receiving all freights, tolls and charges for the use thereof, for the transportation of persons and property upon or over the same as it then was or as it may be at any time in the future be constructed, maintained or acquired.''

The Attorney-General then states the full terms of the said lease, and then proceeds as follows:

''Informant further states that upon the organization of the said St. Louis Merchants Bridge Terminal Railway Company, and by means of the various depots, switches, side-tracks, track connections then constructed and to be constructed by it in said city, and all rights, franchises, privileges, and services thereto belonging, there was provided for the people of St. Louis, and all persons and corporations engaged in business therein, and all persons and corporations in said city requiring railroad connections, tracks, switches, freight cars, terminal and railroad terminal facilities, including depots, warehouses, car storage therein, switching facilities, and railroad track and terminal connections with various railroads running into, through, and from said city of St. Louis, *competition* with the switching and terminal facilities of the aforesaid Terminal Railroad Association of St. Louis; that said Merchants Bridge Terminal Railroad Association as then constituted was, and as the tracks, switches, depots, side tracks, and all other instruments of terminal and railway transfer traffic are now located, is, as originally intended to be, a competitor of the said Terminal Railroad Associa-

tion of St. Louis, owning and operating competing lines of tracks, side tracks, switches, and terminal facilities and equipments with the lines of tracks, side tracks, and switches of the said Terminal Railroad Association of St. Louis and in the city of St. Louis.''

The specific routes of the ''Merchants Bridge Terminal Railway Company'' and of the ''Terminal Railroad Association of St. Louis'' are set forth at length in the information and from which it appears that both companies have tracks into the union station. It is then charged that said St. Louis Merchants Bridge Terminal Railway Company was incorporated for the purpose of engaging in the same kind and character of business as that of the respondent, the Terminal Railroad Association of St. Louis, and to compete with the said respondent in the terminal railroad and transfer business in said city.

It is then averred at length that by an agreement of August 17, 1893, the Terminal Railroad Association of St. Louis acquired and became the successor to all the properties of the Merchants Bridge Terminal Railway Company and the lease of the St. Louis Terminal Railway Company of date of January 2, 1892, and assumed its obligation, and since entering into said contract the respondent dictates, formulates and controls the policy and business of the said Merchants' Bridge Terminal Railway Company, fixes and regulates and controls the tolls, charges and prices to be paid in all freight and freight cars handled, transferred and conveyed by said Merchants Bridge Railway Company and the object of said agreement is to prevent competition of said Merchants Bridge Company. That said agreement so made between said competitive companies is illegal and void; that said contract is in violation of section 17 of article 12 of the Constitution of Missouri and that said lease is in conflict with and violative of section 1062, Revised Statutes of Missouri, 1899, and against the public welfare and public policy of this State.

I.   Section 17 of article 12 of the Constitution of Missouri is in these words:

"No railroad or other corporation, or the lessees, purchasers or managers of any railroad corporation, shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control, any railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owing or having control of a parallel or competing line. The question whether railroads are parallel or competing lines shall, when demanded, be decided by a jury, as in other civil cases."

The demurrer raises *in limine* the question whether the Merchants Bridge Terminal Railway Company and the Terminal Railroad Association of St. Louis are *railroads* or *railroad* corporations within the meaning and spirit of said section 17 of article 12 of the Constitution.

In the opinion of the majority they are not.   We are not able to concur in that view.   The language of the above provision of the Constitution is broad and comprehensive enough to include these *terminal* railroads.   There are no words of exception in the section and nothing in the context which limits the scope of the words, *"no railroad or other corporation* or the lessees, purchasers or managers of *any railroad corporation,"* to trunk line railroads traversing the length and breadth of the State.

These railroads were both organized under the general railroad law of this State to construct, maintain, and operate *standard gauge railroads in this State.*

Having accepted their charters from the State under the general railroad law of the State they are estopped to deny that they are railroads within the meaning of the Constitution which prohibits *any railroad* from consolidating with a parallel or competing rail-

road. These companies are chartered under our general railroad act, and section 1163, Revised Statutes 1899, defines the term "railroad corporation" to mean *all* corporations, companies or individuals owning or operating or which may hereafter own or operate any railroad in this State.

The existence, privileges and powers of these two railroads all depend upon the legislative enactments under which they were organized. By that law they were created *railroad companies*. Can they now, having availed themselves of the franchises and powers they possess and from which they take caste and color, be relieved of all the burdens and restrictions which this law of their creation imposes upon them? We are clearly of the opinion that they can not. When we consider further that they have main tracks and switches just as other railroads have, and that they maintain and operate trains thereon drawn by their own locomotive engines it is impossible to distinguish them from other railroads organized under our general laws for the incorporation of railroads. While it may be urged that they do not own their own passenger or freight cars, it is obvious that this does not militate against the view we have taken. Every railroad in this State is compelled to accept from connecting railroads their cars loaded with freight and carry them over their lines. So that while these two railroad corporations may not have provided themselves with cars in which to transfer freight and passengers, there is nothing to prevent them from so doing whenever they shall elect to do so. In carrying freight for other companies and transferring and switching their cars for them they are engaged in a legitimate exercise of their franchises as railroad companies.

But it is said that the framers of the Constitution and the people when they adopted it did not have *terminal railroads* in view when they inserted section 17 of article 12 in the Constitution and did not intend that

section to apply to *terminal companies* and that the evil which they sought to prevent, to-wit, consolidations to shut out competition, was the apprehension they felt that the great trunk lines then in existence and those to be built from Kansas City to St. Louis and between other distant termini might all pass under one management and thereby deprive the people and shippers of that natural competition which was deemed necessary for their protection, and *not* to *terminal companies* which would afford equal facilities for all roads having a common terminus. It is true that it often occurs that the words of a statute or constitution may be broad enough to cover a specific case when in fact the spirit and true meaning of the law would exclude it. Many illustrations of this rule of construction suggest themselves and it is not necessary to cite instances. In our opinion both of said companies are railroad corporations within the spirit and letter of the Constitution. Were they parallel or competing companies? Competition is just as beneficial between terminal companies as it is between other railroads. It is averred in the information that the purpose of constructing and maintaining the Merchants Bridge and the Merchants Bridge Terminal Railroad Company's railroad was "to engage in *the same kind and character* of business as that of the Terminal Railroad Association of St. Louis, the respondent herein, *in the terminal and railroad and transfer business in St. Louis.*" It does not need any argument to demonstrate that the incorporators of the Merchants Bridge and Merchants Bridge Terminal Railroad would not have invested millions of dollars in those enterprises if they had not felt that the business of St. Louis would justify them in so doing, nor that they intended to enter the field as a competitor for some of the business which it is alleged up to that time was practically monopolized by the Eads bridge and the respondent, the Terminal Railroad Association of St. Louis. More than that, it appears that the Merchants Bridge Railway Com-

pany had already acquired rights of way and built its tracks to a point near the union station in St. Louis and a great system of switch and warehouse tracks and connections and had already projected a line through and around the western limits of the city of St. Louis, to tap the St. Louis and San Francisco Railway Company at Arloe station, thus enabling it to connect with the Missouri Pacific, Wabash and Frisco systems west of the city and thereby made itself a direct competitor for eastern and western bound freights over the Merchants Bridge which it controlled. That it was not fully completed is not an argument that it was not a competitor, but a cogent reason why its competitor should be alert to acquire it before it had succeeded in becoming as formidable as it promised to be.

The purpose of the constitutional provision now under consideration was obviously to prevent railroad monopolies, by denying rival or competing lines the right to consolidate themselves into one company. The policy thus indicated has been adopted in the Constitutions of various States, notably Pennsylvania, article 16, section 12, and article 17, sec. 4; Illinois, article 11, sec. 11; Michigan, article 19, sec. 2; Nebraska, article 11, sec. 3; West Virginia, article 11, sec. 11; Arkansas, article 17, sec. 4; Texas, article 10, sec. 5; Colorado, article 15, secs. 5 and 13, and in Missouri, article 12, sec. 17, in all of which no railroad is allowed to consolidate with a parallel or competing line—and in a number of said States a railroad is not permitted to lease or purchase such competing line, or the officers thereof to act as officers of the other.

In other States, the same result is secured by statutory provisions. What are parallel or competing railroads within the meaning of this provision of our Constitution has been before the courts and the conclusion reached that the true meaning of section 17 of article 12 of our Constitution is that when it speaks of competing roads it means roads that are substantial competitors

for business, a competition that would have an appreciable effect on rates, the controlling idea being to encourage competition, and that when it speaks of "parallel or competing" lines it does not mean lines which are merely geometrically or geographically parallel, but the governing thought is *competing lines*. [Kimball v. Railroad, 46 Fed. 888; State v. Railroad, 24 Neb. 143, 32 Amer. and Eng. R. R. Cases 388; Railroad v. State, 75 Tex. 434.]

In Railroad v. Jarvis (U. S. Circuit Court of Appeals), 15 Am. and Eng. R. R. Cases (New Series) 459, the court said, "Were these two railways 'parallel or competing lines' within the meaning of the Constitution?" After saying they were both designed as belt lines intended to connect the termini of many railroads terminating at East St. Louis with the river transfers to the city of St. Louis, the court said: "We can not doubt that these lines are parallel lines within the meaning and intent of the constitutional provision. The term parallel is not employed in the Constitution in its merely geographical sense. It does not mean two lines of railway that are equidistant from each other. That would be a narrow construction of the constitutional provision, which would defeat its purpose. It means lines of railway having the same general direction and therefore likely to come in competition with each other. We think they were designed to be competing lines of railway."

When it is considered that these two railroad corporations each owned or controlled a railroad bridge across the Mississippi river connecting the union station in St. Luois in which all the railroads from the west concentrated and each connecting with the railroads running into East St. Louis from the north, east and south, and that each had its switches and connections with the various manufacturing plants of the city of St. Louis and bearing in mind always that under our Missouri statutes each was compelled, if required, to connect with other railroads

or suffer them to connect with them, and each to carry and accept for shipments all cars in bulk tendered to them for forwarding, it is impossible to reject the conclusion that in the sense of the Constitution and our statutes they were competing lines and that they came within the purview of the statute forbidding them to consolidate with each other by outright sale or by the lease and contract alleged in the information. We can not accept the reasoning that they are not such competing lines as are forbidden by the Constitution to consolidate. Without further extending this opinion we think the information sufficiently avers that they were competing lines and that the demurrer confesses as much.

The contention that one terminal company offered better facilities for the transfer business and in fact secured more competition than two or more such companies would or could have offered does not commend itself to our judgment. It is the argument advanced in favor of all monopolies, but it is contrary to the words and spirit of the Constitution, and we must believe that if these railroad corporations had each remained a bidder for the immense traffic which is carried on in transferring freight and passengers to and from St. Louis across the Mississippi river under fair and open competition, cheaper and more equitable rates to shippers and the travelling public would have been the inevitable result and such was the purpose of the Constitution.

But it is maintained that even if our laws made no provision for the acquisition by one railroad of the properties of another at the date of the contract or lease of 1893, still as the Legislature of this State at the regular session in 1903 (Laws 1903, p. 127) expressly authorized such purchase when this proceeding was commenced it had become the policy of the State to permit such acquisition and the State can not now be heard to say the contract or lease of 1893 is against its public policy. Two answers can be made to this contention.

First, the act of 1893 is prospective in its terms and does not apply to any previous unauthorized consolidation. It is the settled rule of construction of statutes in this State that statutes shall operate prospectively only unless it clearly appears that they shall retroact upon prior contracts and rights. [Hatcher v. Railroad, 62 Ill. 477; 1 Rorer on Railroads, pp. 59 and 592.]

Secondly, the act of 1903, like the act of 1871, by its terms limits the right of acquisition to railroads which shall form *continuous lines* with the railroad so consolidating with the same, and if we are right in our view that these roads were parallel or competing lines, that act is no authority for the contract of 1893. Acts permitting railroads to extend their lines by acquiring other railroads so as to make a continuous line have ever been construed to negative the right to acquire competing or parallel lines.

The power to rent from, sell, lease or consolidate with any parallel or competing company does not exist in the absence of legislation permitting these things to be done and can not be implied from a prohibition extending to parallel or competing lines. [Railroad v. State, 75 Tex. 434; State v. Railroad, 24 Neb. 143.]

The permission to consolidate with lines which when accomplished will form a continuous line implies the exclusion of all others. That the defendant can not justify its acquisition of the Merchants Bridge Terminal Railway Company's properties by virtue of the authority given to the Union Depot Companies by our laws, I think is evident, because the capital stock of Union Depot Companies is limited by the act authorizing their incorporation to ten millions of dollars (sec. 1164, R. S. 1899), whereas the capital stock of the respondent is alleged to be, and the demurrer admits it to be, $50,000,000, and it is not fair to assume that defendant was violating the charter of the Union Depot Company by capitalizing it for $40,000,000 more than our

laws permit. The consolidation then can not be sustained under the authority conferred upon depot companies.

The extent to which this court should go in decreeing a forfeiture is another question. While the respondent has exceeded its powers in making the contract of 1893 it does not necessarily follow that it should be ousted altogether of its franchises and properties. On the contrary the rule in this and other courts has been to oust it in the first instance only to the extent of depriving it of rights unlawfully acquired. Such was the rule declared by the Supreme Court of Nebraska in State v. Railroad, 24 Neb. 143, which, like this, was a *quo warranto* proceeding. The court in that case forfeited the illegal lease only. And in State ex inf. v. Lincoln Trust Co., 144 Mo. 1. c. 599, it was said, "We are not disposed to enter judgment of ouster from such franchises as are legally possessed by them, but judgment of ouster from the exercise of the franchises not granted them as herein indicated will be entered."

While the State is not barred by the lapse of time, still courts may properly so frame their judgments or decrees as not to work unnecessary injury. The vast amount of capital invested legitimately by the respondent should not be forfeited because respondent made the contract or lease of 1893. Justice will be subserved by compelling respondent to exercise its franchises within the limits of its charter powers and by depriving it of those which it has no right to exercise. The judgment of ouster should go to the extent of adjudging the contract of 1893 void, as in contravention of the Constitution, and in ousting its officers of all control of the Merchants Bridge Terminal Railroad Company and its properties, and requiring said companies to maintain and operate said systems as competing lines. *Robinson, C. J.,* and *Marshall, J.,* concur.