# STATE *et al. v.* UNION RY. CO.

## (*Jackson.*   April Term, 1914.)

**1. COURTS.   Judgment.   Stare Decisis.   Res Judicata.**

A decision that railway company is, in view of its charter and its work, a commercial and not a terminal railway is conclusive as to rights based thereon, whether under the rule of *res judicata* or *stare decisis,* which rights will be protected as against a subsequent demand involving the same question. (*Post, pp.* 707-711.)

Cases cited and distinguished:   Collier v. Union Railway Co., 113 Tenn., 96; State ex rel. Wellford v. Union Railway Co., 113 Tenn., 96.

Case cited and approved:   Wilkins v. Railroad, 110 Tenn., 422.

**2. RAILROADS.   Privilege taxes.   "Railroad terminal corporation."**

A railway company which leases from other railway companies their terminal facilities, and which contracts to do their terminal business, and to provide adequate terminal facilities, and take possession of trains entering receiving tracks, and switch and deliver cars therein to their respective destinations within the switching district, including the delivery of cars to connecting lines, and to render all switching services required for the prompt handling of cars for loading, unloading, or repairs, and to set apart exclusively for the business of the other companies terminal facilities, with the right of exclusive management and control of the terminal facilities, etc., contracts for the performance of duties falling within the functions of a railroad terminal corporation within Shannon's Code, secs. 2430, 2431, providing for the organization of railway terminal companies, and it is liable to privilege taxes imposed on railroad terminal corporations; a railroad terminal corporation being an instrumentality which assists railroad transportation com-

129 Tenn. 45

panies in the transfer of traffic between different lines, and in the collection and distribution of traffic. (*Post, pp.* 711-728.)

Case cited and distinguished: United States v. Terminal R. R. Association of St. Louis, 224 U. S. 383.

Cases cited and approved: Dean v. St. Paul Union Depot Co., 41 Minn., 360; Brady v. Chicago Great Western Railway Co., 114 Fed., 100; Floody v. Great Northern Railway Co., 102 Minn., 81; Belt Railway Co. of Chicago v. U. S., 168 Fed., 542; Union Depot & Railway Co. v. Londoner, 50 Colo., 22; Hunt v. N. Y., N. H. & Hartford Ry. Co., 212 Mass., 102; Memphis & Little Rock R. R. Co. v. State of Tennessee, 77 Tenn., 218.

---

### FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County. —JULIAN C. WILSON, Special Chancellor.

J. W. CANADA and PRATHER McDONALD, for appellant.

BARTON & BARTON and D. B. NEWSOM, for the State.

MR CHIEF JUSTICE NEIL delivered the opinion of the Court.

This bill was filed on the 28th of September, 1911, to recover of the defendant, as a railroad terminal corporation, the privilege taxes fixed by the Legislature on business of that kind for the years 1905 to 1911, inclusive. The chancellor rendered a decree in favor of the State for a total of taxes and penalties, $5,462.50, and in favor of the county for $4,750 taxes, and $712.50

penalty, and for the costs of the cause. From this decree, the defendant has appealed and assigned errors.

It is insisted in behalf of the defendant that it was chartered, not as a railroad terminal company, but as a commercial railway, and such is the fact. It is further insisted that this court, in the consolidated cases of *Collier* v. *Union Railway Co.* and *State ex rel. Wellford* v. *Union Railway Co.*, 113 Tenn., 96, 83 S. W., 155, considered the business it was doing in connection with the terms of the regular form of charter prescribed for commercial railways under which the defendant was chartered and organized, and held that the work it was engaged in fell within the terms of the charter of such commercial railway. It is therefore urged that it is not guilty of exercising privileges not conferred by its charter, and conferred only by the charter of railroad terminal corporations.

*State ex rel. Wellford* v. *Union Railway Co.* was a *quo warranto* proceeding under which it was insisted that the Union Railway Company had no lawful right to exercise the functions it was exercising under the charter of a commercial railway company, and it was sought to forfeit the charter because of these *ultra vires* acts. *Collier* v. *Union Railway Co.* was a case in which the complainant asked an injunction against the railway company's condemnation of certain of the complainant's lands for right of way; the ground of objection being that its business was such that it had no right to condemn lands for the purposes of a commercial railway company. Both cases resulted in an affir-

mation of the decree of the trial court in favor of the railway company.

The road, as described in the opinion referred to, was a belt line, beginning and ending at the same point in the city of Memphis, running around the city in an irregular circle or loop, throwing out here and there spurs and feed lines for the purpose of connecting with the various railroads entering the city of Memphis, and also with the numerous industries that are located in that city.

It was stated in the opinion that the bulk of the business of the road would consist in the transfer of loaded and empty cars from one railroad to another, and from the various industries to the several lines of road centering the city of Memphis and back again; but at the same time, by its charter, it was obligated to do a general railroad business, both as to freight and passengers. The court said:

"In the present case it is shown by the principal officers of the road that it is the purpose of the company to switch cars from one road to another, to receive freight on the line of its road, and give bills of lading over its own and other roads to any part of the world—in other words, to perform all of the functions of an ordinary road. We think, therefore, that it is clearly established both by the charter and parol evidence that the road is intended to subserve a public use, to confer a public benefit, to meet a public necessity; in short, to do any and everything that is required of an ordinary public commercial railroad."

Again the court said:

"The fact that its principal and most important business is the transfer of loaded and empty cars from one point to another does not make it any the less a commercial railroad under the provisions of the general law. The fact that a railroad running through a coal section does most of its business in the hauling of coal does not make it any the less a commercial road such as is contemplated by the general statutes. The fact that passengers may rarely, if ever, pass over the line does not deprive it of its character as a railroad. The fact that it may run in a direction or through localities where passengers do not desire to go does not deprive it of its *status* as a railroad. The fact that its main business is freight business, and a business in bulk, does not make it the less a public use."

The evidence in the present case shows that defendant has failed in actual conduct to answer, in some respects, the description given of its anticipated activities. It does not perform any of the functions of an ordinary commercial railway, except in the matter of conveying freight from one industry to another situated on its line or lines. It does not transfer cars in the sense that commercial railroads do when they accept cars from a connecting line, and deliver on their own line, and return to the company from which they were received. It does no passenger business, nor does it issue any bills of lading in its freight business, but only orders to its trainmen showing where cars are to be taken up

or delivered.  It does not participate in a division of through rates with the railway companies it serves, but exacts a fixed charge prescribed by ordinances of the city; and its dealings are wholly with the railroads, and are not at all with the shippers, except in conveying freight from one industry in the city to another. But the court held in the cases referred to, to which the State was a party, that athough the bulk of its business was to consist "in the transfer of loaded and empty cars from one railroad to another, and from the various industries to the several lines of road centering in the city of Memphis and back again," it was nevertheless a commercial railroad, because by its charter it was obligated to do a general railroad business both as to freight and passengers, and that its charter rights were not subject to forfeiture because of the nature of the bulk of its business above referred to, and that it might condemn property as a commercial railway.  Whether that decision be sound or not, it is bootless to inquire with a view to the settlement of the present controversy. Vested rights of a very important nature are based on it, and are entitled to protection.  Therefore, whether we view the case from the standpoint of *res adjudicata,* specially pleaded by the defendant, or on the broader ground of the necessity of standing by decisions in respect of rights based on them, although the decisions may have been originally erroneous (a subject discussed at length in *Wilkins* v. *Railroad,* 110 Tenn., 422, 452-461, 75 S. W., 1026), so much of the bill

must be dismissed as is rested on the fact that the defendant transacts the bulk of its business in the manner already stated.

We are of the opinion, however, that a different result must be held to follow under a contract which the Union Railway Company entered into with the Iron Mountain Railroad Company of Memphis and the St. Louis, Iron Mountain & Southern Railway Company on October 1, 1909.

Under that contract the Union Railway Company leased from the two railroads mentioned their terminal facilities, consisting of sundry tracks in the city of Memphis, also a roundhouse, repair shops, a turntable, and freight and passenger depots. In return for the lease the Union Railway Company, in addition to keeping down certain fixed charges on the property, contracted to do the terminal business of the second named company, and also of an associated company, the St. Louis Southwestern Railroad Company. It agreed that it would provide and maintain a connection of its tracks with those of the Kansas City & Memphis Railway & Bridge Company, the bridge of which company had to be used by the St. Louis, Iron Mountain & Southern Railway Company to get into Memphis from the Arkansas side; that it would provide adequate terminal tracks, depots, or other facilities in the city of Memphis, and would perform all services that from time to time should be required during the full term of the contract to promptly and satisfactorily receive and forward the passenger and freight trains of the said rail-

way company, and of the St. Louis Southwestern Railroad Company handled by the first-mentioned company; that upon the delivery of the trains of the said St. Louis, Iron Mountain & Southern Railway Company, called for brevity's sake in the contract the Iron Mountain Company, within the city of Memphis upon the tracks of the said Union Railway Company, designated by it for receiving said trains, the latter would promptly take possession thereof and switch and deliver the cars therein to their respective destinations within the Memphis switching district, including the delivery of cars destined to connecting lines; that it would promptly receive from connecting lines cars destined for forwarding *via* the Iron Mountain Company, or by the St. Louis Southwestern Railway Company, and would classify and assemble said cars into trains with such cars as might be made ready for forwarding upon the tracks of the said Union Railway Company, and those leased or operated by it; that the cars should be assembled into trains in such manner as the Iron Mountain Company should from time to time direct; that when so assembled the trains should be forwarded to a connection with the tracks of the Kansas City & Memphis Railway & Bridge Company with the locomotives and train crews of the Iron Mountain Company at such time and in such manner as the Iron Mountain Company should direct; that it would render any and all switching services required for the prompt handling of cars to be loaded, unloaded, or repaired, received from or for the Irom Mountain Com-

pany as aforesaid; that it would maintain and operate the passenger depot facilities used at the time the contract was entered into by the Iron Mountain Company and the St. Louis Southwestern Railway Company until such time as these companies should for any cause desire to discontinue the use of the said passenger depot facilities; that the Union Railway Company would furnish all employees required in or about said passenger depot, except the ticket agent, both of the St. Louis Southwestern Railway Company, and of the Iron Mountain Company, assuming full and complete liability for the acts, neglect, and defaults of employees furnished as aforesaid; that it would maintain the freight depots and tracks of the Iron Mountain Railroad Company of Memphis, called for short in the contract the Memphis Company, occupied and used at the time the contract was entered into by the Iron Mountain Company and by the St. Louis Southwestern Railway Company, and would from time to time during the term of the agreement extend and improve said facilities to such extent as might be required to promptly and satisfactorily handle the freight business of the Iron Mountain Company and of the St. Louis Southwestern Railway Company that it would employ a joint agent and sufficient force of joint employees to conduct the business of the parties to the contract at the said freight depots, and to satisfactorily handle the freight business of the Iron Mountain Company, to perform all station work, including the receipt, checking, weighing, billing, loading, transferring, unloading, de-

livery of, and collection of charges upon all freight
of the Iron Mountain Company; that such joint agent
and other employees should at all times be persons sat-
isfactory to the Iron Mountain Company; that, if such
joint agent or other joint employees were not satis-
factory to the Iron Mountain Company, he or they
should, upon written request, be removed, and other
persons acceptable to the Iron Mountain Company be
engaged in their stead by the Union Company; that
such joint agent and all other joint employees should,
in respect of the business done for each company, "be
subject to the rules, regulations, control, and require-
ments of each of the parties hereto," the same as if
employed solely by such party; that the Iron Moun-
tain Company should furnish to the said joint agent
sufficient of its own printed forms and stationery with
which to transact its business, and should be reim-
bursed monthly by the Union Railway Company for
the cost thereof; that such joint agent and other em-
ployees should at all times transact the business of the
parties to the contract impartially, showing or giving
no preference to either party as against the other; that
the said joint agent and all other joint employees, so
far as the custody of any moneys and revenues might
be concerned, should be considered the sole and sepa-
rate agent and employees of the company for which he
or they should receive or handle such moneys and rev-
enue, and that neither party should be liable to the oth-
er party to the contract through the handling of
moneys of the other party by such joint agent or other

State v. Union Ry. Co.

joint employees; that, in case of default, theft, or loss of money through the negligence of such joint agent or other joint employee, the amount of cash on hand at the time of such defalcation, theft, or loss should, on investigation being made to determine the amount be apportioned between the parties to the contract on the basis of the amount due each company, such amount to be determined by the audit of the parties of the accounts of such joint agent and other joint employees; that the Union Railway Company should assume full and complete liability for the acts, neglects, or defaults of such joint agent and other joint employees in respect of the freight business of both parties to the contract, that is, of the Iron Mountain Company, and of the St. Louis Southwestern Railway Company, except as to the loss of money; that the Union Railway Company should carry fire insurance in such amounts as the Iron Mountain Company should from time to time direct upon freight while in the possession of said Union Railway Company, received for or from the Iron Mountain Company, such insurance being placed with insurance companies approved by the Iron Mountain Company, and covering freight loaded in cars or wherever located upon property owned, leased, or operated by the Union Railway Company; that it would promptly remit to the treasurer of the Iron Mountain Company all moneys received by it from the collection of Iron Mountain storage charges, car demurrage charges, and from whatsoever source received for account of revenue earned by or apportionable to the

Iron Mountain Company; that all records and accounts of the Union Railway Company affecting the business of the Iron Mountain Company to be done under the contract should be kept as directed by the Iron Mountain Company, and subject to inspection by the officers of the Iron Mountain Company at all times.

The contract further required that the Union Railway Company should provide and maintain facilities equal to those used at the making of the contract by the Iron Mountain Company for cleaning and storing Iron Mountain locomotives, including those of the St. Louis Southwestern Railway Company when received with their trains by the Union Railway Company; that it should make running repairs to locomotives, equip them with supplies, and deliver them, attached to trains ready for forwarding, to the employees of the Iron Mountain Company, or to those of the St. Louis Southwestern Railway Company, as the case might be, and would also make running repairs to other locomotives of the Iron Mountain Company when requested by that company to do so; that it would store, clean, and furnish supplies to passenger coaches and equipment of the Iron Mountain Company and the St. Louis Southwestern Railway Company; that it would carefully inspect the trains received from the Iron Mountain Company and the St. Louis Southwestern Railway Company, and would, when ready for forwarding, deliver the cars therein to said companies in the same condition of repair as when received, or properly carded under the rules of the Master Car Builders' Association,

for defects or damages sustained while in the possession of the Union Railway Company; that cars received from the Iron Mountain Company requiring repairs preparatory to loading, or to make them safe for forwarding, should be so repaired by the Union Railway Company; that cars destined to connections should be delivered in the same condition of repair as received by the said Union Railway Company, or if such cars when received should require repairs under Master Car Builders' Association rules, or local rules effective at Memphis, before connections could be required to receive them, such repairs should be promptly made by the Union Railway Company; that the said latter company would carefully inspect cars from connecting lines destined for forwarding *via* the Iron Mountain Company, and would receive or reject them under Master Car Builders' Association rules, or local rules in effect at Memphis; that such cars as it should be required to receive under said rules which were unsafe to be forwarded should be transferred or repaired by the said Union Railway Company; that the repairs of cars made by the latter company which were chargeable under the rules of the Master Car Builders' Association to the owners of the cars should be made at the expense of the owners, and the Union Railway Company should collect such charges from the owners; that proper bills for repairs chargeable to the Iron Mountain Company should be presented to that company for payment.

It was further agreed that the Union Railway Company should set apart exclusively for the business of the Iron Mountain Company, and of the St. Louis Southwestern Railway Company, as directed by the Iron Mountain Company, all of the lands, tracks, buildings, and terminal facilities of the Memphis Company in the city of Memphis (the Memphis Company as stated, being the Iron Mountain Railroad Company of Memphis), except such lands, buildings, tracks, or portions of them as the Union Railway Company might desire to use in receiving cars from connecting lines for forwarding, and for, or in connection with, the handling of traffic, originating upon, or destined for delivery upon, the tracks of the Union Railway Company, or upon industrial tracks connecting therewith.

In consideration of these obligations so entered into on the part of the Union Railway Company and others specified in the contract, but not mentioned in this opinion, the Iron Mountain Company agreed that upon execution of the contract it would surrender the use and operation of the said terminal facilities.

It should be stated that the Iron Mountain Railway Company of Memphis, called the Memphis Company, as stated, owned the terminal facilities, but, under an arrangement between that company and the Iron Mountain Company, the latter had the right to operate these terminals, and had sublet certain passenger and freight depot facilities of the Memphis Company to the said St. Louis Southwestern Railway Company, and had agreed to transport its freight cars between

Memphis and Fair Oaks, Ark., and perform the necessary switching services at Memphis. The passenger trains of the St. Louis Southwestern Railway Company are also handled between Memphis and Fair Oaks over the Iron Mountain Company's tracks by St. Louis Southwestern Railway Company's locomotives and crews. These two companies had no tracks of their own in the city of Memphis, or in the State of Tennessee. Their lines terminated in Arkansas, but connected with the tracks of the bridge company across the Mississippi river, and these with the tracks of the Memphis Company. These two companies, it thus appears, were wholly dependent for their terminal operations on the trackage and terminal facilities of the Memphis Company, which, as stated, were under the control of the Iron Mountain Company.

It was agreed that the Iron Mountain Company would, during the full term of the contract, deliver to the Union Railway Company all of its freight trains destined to the city of Memphis upon the tracks of the Union Railway Company designated by it for receiving such trains, and would, with its motive power, train crews, and enginemen, and at its sole expense of operation, transport said trains over tracks owned, leased, or operated by the Union Railway Company to such point within the city of Memphis; that it would, during the full term of the contract promptly receive all of its freight trains originating at Memphis destined to its line from the Union Railway Company at such points within the city of Memphis as the latter

might from time to time designate, and would transport the same, with its motive power, train crews, and enginemen, at its sole expense of operation over the tracks owned, leased or operated by the Union Railway Company to a connection with the tracks of the bridge company within the city of Memphis, provided that the expense to the Iron Mountain Company of transporting such trains from the points assembled to a connection with the tracks of the bridge company should not exceed the expense heretofore incurred by the Iron Mountain Company in transporting said trains between Calhoun avenue and the said connection; that it would, during the full term of the contract, or until it should have given reasonabe notice of its desire to otherwise arrange, deliver to, and receive from the Union Railway Company its passenger trains and those of the St. Louis Southwestern Railway Company at the point where the passenger station was located at the time of the contract.

It was further provided that the Union Railway Company should have exclusive management and control of the property of the Memphis Company during the life of the contract. The contract also contained this provision:

"In delivering its trains to the Union Railway Company as herein provided, notwithstanding that the enginemen and trainmen are paid by the Iron Mountain Company, said enginemen and trainmen shall, while on its tracks, be considered the employees of the Union Railway Company, and subject to its rules, regulations,

and directions. If said enginemen and trainmen shall refuse or fail to obey instructions given by proper officers of the Union Railway Company, or disregard its rules, regulations, or directions, they shall be disciplined by the Union Railway Company, and a proper officer of the Iron Mountain Company shall be duly notified thereof.

"Said Union Railway Company shall defend and save harmless said Iron Mountain Company and said Memphis Company from all claims and demands, suits, and causes of action for damages on account of injuries to or death of persons, loss of and damage to property caused by the operation of engines, trains, and cars of the Iron Mountain Company, and the equipment of other companies delivered to said Union Railway Company by said Iron Mountain Company, and said Union Railway Company shall also pay said Iron Mountain Company all damages done to its engines, trains, and cars, and to the equipment of other companies delivered by the Iron Mountain Company to the Union Railway Company."

It was further provided that the Iron Mountain Company should direct the time and manner of the loading, moving, and disposition of all cars handled by the Union Railway Company for account of the Iron Mountain Company, in the same manner as if said cars were upon the rails of the Iron Mountain Company.

We are of the opinion that nearly all of the duties thus assumed by the Union Railway Company are such

as fall within any definition of the functions of a terminal company, and that many of them are such as do not pertain to the duties of a commercial railway. Some of them certainly go far beyond the very comprehensive construction given to the charter of the Union Railway Company in the cases of *State ex rel. Wellford* v. *Union Railway Co.,* and *Collier* v. *Union Railway Co.,* supra.

In the case of *United States* v. *Terminal R. R. Association of St. Louis,* 224 U. S., 383, 402, 32 Sup. Ct., 507, 512, 56 L. Ed., 810, 816, 817, we find a definition of terminal companies as distinguished from railroad transportation companies.

Speaking through Mr. Justice Lurton, the court said:

"We are not unmindful of the essential difference between terminal systems properly so described and railroad transportation companies. The first are instrumentalities which assist the latter in the transfer of traffic between different lines, and in the collection and distribution of traffic. They are a modern evolution in the doing of railroad business, and are of the greatest public utility."

Referring to a litigation in Missouri that has been instituted for the purpose of dissolving a combination between two terminal companies, the court further said:

"For the purpose of enforcing this Missouri prohibition the State instituted a proceeding to dissolve the combination of the properties of the Merchants'

Bridge Terminal Railroad Company with the Terminal Railroad Association of St. Louis, upon the ground that the railroads operated by those companies were parallel and competing lines of railroad. Relief was denied. The Missouri court held that the merger of mere railway terminals used to facilitate the public convenience by the transfer of cars from one line of railway to another, and instrumentalities for the distribution or gathering of traffic, freight or passenger, among scattered industries, or to different business centers of a great city, were not properly railroad companies within the reasonable meaning of the statutes forbidding combinations between competing or parallel lines of railroad. Referring to the legitimate use of terminal companies, the Missouri court said:

" 'A more effectual means of keeping competition up to the highest point between parallel or competing lines could not be devised. The destruction of the system would result in compelling the shipper to employ the railroad with which he has switching connection, or else cart his product to a distant part of the city, at a cost possibly as great as the railroad tariff.

" 'St. Louis is a city of great magnitude in the extent of its area, its population, and its manufacturing and other business. A very large number of trunk line railroads converge in this city. In the brief of one of the well informed counsel in this case it is said that St. Louis is one of the largest railroad centers in the world. Suppose it were required of every rail-

road company to effect its entrance to the city as best it could and establish its own terminal facilities; we would have a large number of passenger stations, freight depots, and switching yards scattered all over the vast area and innumerable vehicles employed in hauling passengers and freight to and from those stations and depots. Or suppose it became necessary, in the exigency of commerce, that all incoming trains should reach a common focus, but every railroad company provide its own track; then not only would the expense of obtaining the necessary rights of way be so enormous as to amount to the exclusion of all but a few of the strongest roads, but, if it could be accomplished, the city would be cut to pieces with the many lines of railroad intersecting it in every direction, and thus the greatest agency of commerce would become the greatest burden.' [*State* v. *Terminal R. R. Ass'n*] 182 Mo. 284, 299, 81 S. W., 395.

"Among the cases in which the public utility of such companies has been recognized are *Bridwell* v. *Gate City Terminal Co.*, 127 Ga., 520, 56 S. E., 624, 10 L. R. A. (N. S.) 909; *Indianapolis Union R. Co.* v. *Cooper*, 6 Ind. App., 202, 33 N. E., 219; *State ex rel. Little* v. *Martin*, 51 Kan., 462, 33 Pac., 9; *Worcester* v. *Norwich & W. R. Co.*, 109 Mass., 103; *Fort Street Union Depot Co.* v. *Morton*, 83 Mich., 265, 47 N. W., 228; *State* v. *St. Paul Union Depot Co.*, 42 Minn., 142, 43 N. W., 840, 6 L. R. A., 234; *Ryan* v. *Louisville & N. Terminal Co.*, 102 Tenn., 124, 50 S. W., 744, 45 L. R. A., 303."

The court was considering in *United States* v. *Terminal Railroad Association of St. Louis* the question whether a combination of the several railroad terminal companies in St. Louis was a violation of the Sherman anti-trust law; but the observations made in the course of the opinion upon the nature and character of railway terminal companies which we have quoted are very useful as showing the views of the highest court of the land upon this important subject. Other cases which are in strict accord as to the nature and character of these companies as they are described in the opinions of the courts are as follows: *Dean* v. *St. Paul Union Depot Co.,* 41 Minn., 360, 43 N. W., 54, 5 L. R. A., 442, 16 Am. St. Rep., 703; *Brady* v. *Chicago Great Western Railway Co.* 114 Fed., 100, 52 C. C. A., 48, 57 L. R. A., 712, 717, 718; *Floody* v. *Great Northern Railway Co.,* 102 Minn., 81, 112 N. W., 875, 1081, 13 L. R. A. (N. S.), 1196; *Belt Railway Co. of Chicago* v. *United States of America,* 168 Fed., 542, 93 C. C. A., 666, 22 L. R. A. (N. S.), 582; *Union Depot & Railway Co.* v. *Londoner,* 50 Colo., 22, 114 Pac., 316, 33 L. R. A. (N. S.) 433;*Hunt* v. *New York, New Haven & Hartford Railway Co.,* 212 Mass., 102, 98 N. E., 787, 40 L. R. A. (N. S.), 778, and notes.

Such companies have not only the right of eminent domain, as laid down in our own case of *Ryan* v. *Louisville & N. Terminal Co.,* supra, but can also be compelled by *mandamus* to observe an order of the railroad commission to admit another railroad to its priv-

ileges pursuant to the order of such commission prescribing terms. 26 Cyc. 375, and notes.

The fact that commercial railway companies necessarily, under through routings, deliver the cars of other railroad companies on their own terminals to the destinations of such cars thereon, which duty is likewise imposed by the charter of such companies in this State, should not be confounded with the more complicated terminal duties of railway terminal companies which act as go-betweens or intermediaries between the numerous railroads with which they are in physical contact.

We have in this State a form of charter for railway terminal companies, passed by the Legislature in the year 1893. Its terms are meager but are sufficiently broad and general to cover the duties which companies of this character are designed to serve in modern business.

That charter provides:

"Said corporation shall have the power to acquire, in this or any other State or States, and at such place or places as shall be found expedient, such real estate as may be necessary on which to construct, operate, and maintain passenger stations, comprising passenger depots, office buildings, sheds and storage yards and freight stations, comprising freight depots, warehouses, offices and freight yards, roundhouses and machine shops; also main and side tracks, switches and cross-overs, turnouts, and other terminal railroad facilities, appurtenances and accommodations suitable in

size, location, and manner of construction, to perform promptly and efficiently the work of receiving, delivering and transferring all passenger and freight traffic of railroad companies, with which it may enter into contracts for the use of its terminal facilities at such place or places. Said corporation shall have the power, by purchase, lease, or assignment of lease, to acquire and hold, and to lease to others, such real estate as may be necessary for the above-mentioned purpose of its incorporation; and it may also acquire such real estate by condemnation in pursuance of the general law authorizing the condemnation of private property for works of internal improvement, as set forth in sections 1844-1867, inclusive." Shannon's Code, section 2430.

The next section provides:

"Whenever it may be necessary, in order to enable said corporation to acquire and construct proper railroad terminal facilities in any town or city, or to connect such facilities with the tracks of any railroad company with whom said corporation may have contracted to furnish such facilities, said corporation, with the consent of the proper authorities of such town or city, shall have the right to lay and operate a track or tracks across or along or over or under such of the streets or alleys of such town or city as may be necessary for that purpose, and said corporation may also, with such consent, construct such passenger or freight depots or stations across or along, over or under, any such street or alley when it shall be necessary in order to furnish proper railroad facilities in said town or

city. But no street or alley of any town or city shall be obstructed or interfered with until the consent of the proper authorities of said town or city shall have been first obtained.''

It is perceived from the description we have given by quotations from our statutes, and from the decisions of courts, there can be no doubt that under the contract which the Union Railway Company entered into with the Iron Mountain Company and other companies in that interest, in the year 1909, it is doing the business of a terminal railway company, and as such it is liable for the privilege taxes assessed against such companies by the State and Shelby county for the years 1909, 1910, and 1911. It has been held that, where a commercial railway company superadds to duties required of it by its charter other forms of business, it must pay the privilege tax therefor. It was so held in the case of *Memphis & Little Rock Railroad Co.* v. *State of Tennessee,* 9 Lea (77 Tenn.), 218, 42 Am. Rep., 673, in which case it appeared that the railway company had added to its ordinary business that of an express company.

The result is that the decree of the chancellor, in so far as it held the defendant liable for privilege taxes prior to the year 1909, must be reversed but, as to the taxes for the subsequent years, it is affirmed.

The costs of this proceeding will be divided in the following proportions: One-fourth to be paid by the State of Tennessee, one-fourth by Shelby county, and one-half by the defendant.