SEQUATCHIE & SOUTH PITTSBURG COAL & IRON CO. *et al.*
  *v.* TENNESSEE COAL, IRON & RAILWAY COMPANY.

## (*Nashville.*  December Term, 1914.)

1. **PUBLIC LANDS.**  Entries.  "Checkerboard system."

Entries on lands based on the "checkerboard system," that is, one
  entry built on another, and a third on the second, are valid.
  (*Post, pp.* 224, 225.)

Case cited and approved:  Coal Co. v. Scott, 121' Tenn., 88.

2. **EVIDENCE.**  Weight.  Credibility of witness.

Where, in a prior suit, the question determinative of title to
  the land in controversy was decided, the decision will not be
  disturbed on the testimony of a witness who contradicted his
  testimony in the first case, giving evidence to meet the court's
  ruling.  (*Post, pp.* 225-227.)

Case cited and distinguished:  McEwen v. Coal & Land Co., 125
  Tenn., 694.

3. **PUBLIC LANDS.**  Grants.  Special entry.

That subsequent entries referred to an earlier entry, which, how-
  ever, was not surveyed until after the subsequent entries, does
  not supply the requisite notoriety to render the first entry
  special, on the theory that its boundaries were well established.
  (*Post, pp.* 227-229.)

Case cited and approved:  Hitchcock v. Southern Iron & Timber
  Co., 38 S. W., 588.

4. **COURTS.**  Precedent.  Stare decisis.

While the principle of *res judicata* does not apply where the
  action is between different parties, the courts will under the
  doctrine of *stare decisis,* follow a prior decision adjudicating
  the title to the land in controversy.  (*Post, pp.* 229, 230.)

Cases cited and approved:  Kolb v. Swann, 68 Md., 516; Railroad
  v. United States, 168 U. S., 1; De Bearn v. Deposit Co., 233

U. S., 32; Bienville Water Supply Co. v. Mobile, 186 U. S., 217; State v. Union Railway Co., 129 Tenn., 705.

5. **PUBLIC LANDS. Grants. Construction.**

Where land grants, after describing the property, closed with the words "excluding all prior legal claims," such grants did not exclude an earlier grant which was not special, though it had been surveyed. (*Post, pp.* 230-232.)

Case cited and distinguished: Bowman v. Bowman, 40 Tenn., 48.

Cases cited and approved: Fowler v. Nixon, 54 Tenn., 719; Bleidorn v. Pilot Mountain Co., 89 Tenn., 211; Wright v. Hurst, 122 Tenn., 656; Iron & Coal Co. v. Schwoon, 124 Tenn., 176; King v. Coleman, 98 Tenn., 561.

6. **PUBLIC LANDS. Grants. Filing of caveat.**

That the holder of a subsequent special grant did not file a caveat to test the validity of an earlier grant which was not special does not preclude a later attack; the caveat provided for by Acts 1806, ch. 2, and Acts 1825, ch. 22, not doing away with the action of ejectment. (*Post, pp.* 232-236.)

Acts cited and construed: Acts 1806, ch. 2, secs. 16 and 17; Acts 1825, ch. 22.

Cases cited and approved: Peck v. Eddington, 2 Tenn., 331; Gould v. Hoyle, 4 Tenn., 100; Bugg v. Norris' Lessee, 12 Tenn., 326; Peeler v. Norris, 12 Tenn., 331; Heirs of Williamson v. Buchannan, 2 Tenn., 278; McGavock v. Shannon, 13 Tenn., 128; Vaughn v. Hatfield, 13 Tenn., 236; Williams v. Wilson, 8 Tenn., 248.

7. **ADVERSE POSSESSION. Exclusive possession. Necessity.**

Where defendants entered into peaceable possession of land, they could maintain as against the true owner, who also entered, proceedings in unlawful entry and detainer, and have him removed; but, having failed to do so and acquiesced in the owner's possession of another part of the premises, the possession of the parties must be deemed concurrent. (*Post, pp.* 236-241.)

Cases cited and distinguished: Nowell v. Gray, 31 Tenn., 96; Waddle v. Stuart, 36 Tenn., 535; Creech v. Jones, 37 Tenn., 632.

Iron Co. v. Railroad.

8. **ADVERSE POSSESSION.   Concurrent possession.   Effect.**

Where, after defendant was in possession of a portion of a tract of land to which complainant had the legal title, complainant also entered and held possession for some years, his title gave him constructive possession of the entire tract, except that portion actually held by defendant, and defendant's possession could not, where it did not continue for the statutory period after complainant deserted the land, ripen into adverse title. (*Post, pp.* 236-241.)

9. **EQUI-TY.   Proceedings.   Introduction of documents.**

In equity, a deed which proves itself is admissible without notice, the matter being governed by the ancient chancery practice; neither the statute nor court rules having prescribed the practice.   (*Post, pp.* 241-243.)

Code cited and construed:   Page 1777 (S.); secs. 6271-6281 (S.).

Cases cited and approved:   Pardee v. De Cala, 7 Paige, 132; Kellogg v. Wood, 4 Paige, 578; Barrow v. Rhinelander, 1 Johns Ch., 550; Consequa v. Fanning, 2 Johns Ch., 481; Miller v. Avery, 2 Barb. Ch., 582.

10. **QUIETING TITLE.   Recovery of land.   Defenses.**

Proof that title to a portion of the land which complainant seeks to recover was subject to an outstanding title is a good defense. (*Post, pp.* 241-243.)

FROM GRUNDY.

Appeal from the Chancery Court of Grundy County. —V. C. ALLEN, Chancellor.

BROWN, SPURLOCK & BROWN, for appellant.

CHAS. C. MOORE, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the
Court.

The bill was filed in the chancery court of Grundy
county to recover three tracts of land, 642 acres, 142
acres, and 190 acres, all lying inside defendant's Mc-
Ewen grant No. 7892, the first two tracts within com-
plainant's Samuel B. Barrell grant No. 5099, the last
lying partly within the grant last mentioned, and partly
within complainant's Samuel B. Barrell grant No. 5090.
The Barrell grants are the oldest, but the McEwen
grant purports to be based on an entry in the name
of Church Lanier antedating the said Barrell grants,
and if that entry was special within the meaning of
that term in our land law, the McEwen grant will re-
late to it, and so override the Barrell grants.   In or-
der to determine the specialty of the Church Lanier
entry reference will have to be made to a prior entry
in the name of Peter Yeates, since, under what is
known as the checkerboard system of entries in this
State (*Coal Co.* v. *Scott,* 121 Tenn., 88, 114 S. W., 930),
one entry may be built on another, and a third on the
second, and so on through a series.   It is claimed
for the Church Lanier entry that it is so related to
the Peter Yeates entry, and that the latter was special.
If the Peter Yeates entry was not special, then the
Church Lanier entry cannot be special.

Again: The defendant claims to have had seven
years' adverse possession of the lands before complain-

ants' bill was filed, and that it is therefore protected under the act of 1819.

It is also insisted for defendant that the title to part of the land is outstanding in a third party.

There are other questions related to the foregoing which will appear in the course of the opinion.

The chancellor decreed in favor of the complainants, and the defendant has appealed and assigned error.

1. One of the main questions to be determined in this case is whether the Peter Yeates entry No. 4042 was special. The language of that entry is:

"Peters Yeates enters 5,000 acres of land in Warren county, Tennessee, on Cumberland mountain on the headwaters of Collins river. Beginning on a black oak standing on the bluff of the right-hand fork of Collins river; thence meandering said bluff, eastwardly crossing Little Laurel; thence northwardly; thence westwardly; thence southwardly to the beginning, plotting out prior claims."

This question was before the court in the case of *John J. McEwen* v. *Thomas Coal & Land Co.*, 125 Tenn., 694, 148 S. W., 222, and it was there said:

"The call in the entry under consideration which, it is claimed, points out the locality intended to be appropriated by it is 'meandering said bluff eastwardly crossing Little Laurel.' It is argued that this call shows that the entry should cross Little Laurel where it pours over the bluff of the right-hand fork of Collins river, and it would therefore include a particular point of

131Tenn 15

the Little Laurel and thus locate the land. This con-
clusion, however, is predicated upon a false premise.
The entry does not say that the survey should cross
Little Laurel where it pours over the bluff of the west
fork of Collins river. Little Laurel is a stream some
six or seven miles long, flowing through the Yates
entry in a southerly direction, and pours over a bluff
some 400 poles south of the southern boundary line of
the entry according to the survey claimed by complain-
ant. It is thus shown that the official surveyor did not
understand the entry to have the meaning now ascribed
to it. The survey of the other entries in the system,
as shown by the map, Exhibit 1, supra, likewise shows
that no one claiming an interest in this checkerboard
system understood that the Yates entry was to cross
Little Laurel upon its south line where it pours over
the bluff. So, if this entry be treated as sufficiently
special to admit of extrinsic evidence of the location of
the objects called for, it is seen that the call for Little
Laurel cannot refer to any particular point or spot of
land. This call of the entry does not direct that Little
Laurel be crossed where it flows over the bluff, nor,
indeed, can it be gathered from it alone that the creek
in fact flows over the bluff. We are therefore of opin-
ion that the Yates entry is not special.''

It is insisted that in the present case evidence has
been brought before the court additional to that seen
and read by the court in *McEwen* v. *Thomas Coal &
Land Co.*, supra, which would make it incumbent on
the court to reach a different conclusion. The evidence

is substantially the same in the two cases, on the subject in hand, except the testimony of Mr. Lanier, accompanied by a new map, showing that the bluff is more than 400 poles further north than shown by the Deakins map, Exhibit No. 1, to Deakins' deposition, and reaching up into what is designated on the map as the Peter Yeates entry, so that it appears from this new map filed by Mr. Lanier that Little Laurel pours over the bluff of the right-hand fork of Collins river at the place where the south line of the entry crosses the said Little Laurel, thus neatly meeting the conclusion of the court in the *McEwen Case*. This new testimony, however, is opposed by the former testimony of Mr. Lanier, in which he certified to the correctness of the Deakins map, also by the testimony of the witnesses A. R. McKenzie, J. H. McKenzie, J. F. Baker, and J. D. Trueblood, who say that the Deakins' map 4, No. 1, correctly locates the bluffs referred to as about 400 poles south of the south line of the entry as shown on the map. In this state of the evidence we cannot do otherwise than adhere to our former ruling.

To show that the Peter Yeates entry had the requisite notoriety, we are referred to the fact that two or three other entries called for it before it was surveyed. Thus: The Peter Yeates entry was made October 10, 1835, but, according to the record, not surveyed until October 19, 1836, yet the Elias Mayo entry, No. 4216, made May 16, 1836, called for the "southwest corner of the 5,000-acre tract of land entered in the name of Peter Yeates;" also Elias Mayo entry No. 4267, en-

tered September 5, 1836, and surveyed September 5, 1836, read as follows:

"Beginning on Peter Yeates' ·south boundary line on a hickory, white oak, and dogwood, and running east, passing said Yeates corner at 320 poles," etc.

John Gross entry No. 4287, made September 22, 1836:·

"Beginning on a hickory on the east side of Little Laurel, and running with Peter Yeates' line north," etc.

If we had not before us the language of the entry showing it had no such calls or points, these references would show, as in the case of *Hitchcock* v. *Southern Iron & Timber Co.*, 38 S. W., 588, that the Peter Yeates entry was notorious, and had such lines and corners. From the references quoted, it seems to us that only two conclusions are possible; either the date of the survey of the Peter Yeates entry is erroneously given in the record, and in fact must have antedated the entries quoted as referring thereto, or there was some oral communication at the time between the parties concerned as to where the southeast corner was expected to be made, that is, on the hickory tree, because it is impossible that the particular references could be obtained from the language of the Peter Yeates entry:

"Beginning on a black oak standing on the bluff of the right-hand fork of Collins river; thence meandering said bluff eastwardly crossing Little Laurel; thence

northwardly, thence westwardly, thence southwardly, to the beginning.''

The references quoted, therefore, cannot be held to add anything justifying a conclusion that the said Peter Yeates entry was special.

It was held in the *McEwen Case,* supra, that the survey would not give the entry the requisite notoriety to make it special, and we shall not reopen that question; therefore it is unnecessary to refer to those entries mentioned in the brief which called for the Peter Yeates entry after it was surveyed.

From what has been written, it is apparent that we have considered anew the question of the speciality of the Peter Yeates entry; but it is not to be inferred from this fact that we concede that such a course was obligatory. We might have contented ourselves with the statement that the defendant had already had ample opportunity to be heard on this question, in the *McEwen Case,* since, even if that case cannot be treated as strictly *res adjudicata* on this question, for want of any of the technicalities applicable to that defense, still it not being made to clearly appear that the former decision was erroneous, the rule of *stare decisis* would apply. 2 Black on Judgments, section 603; *Kolb* v. *Swann,* 68 Md., 516, 13 Atl., 379; *Southern Pac. R. R.* v. *United States,* 168 U. S., 1, 18 Sup. Ct., 18, 42 L. Ed., 355; *De Bearn* v. *Deposit Co.,* 233 U. S., 32, 34 Sup. Ct., 584, 58 L. Ed., 833; *Bienville Water Supply Co.* v. *Mobile,* 186 U. S., 217, 22 Sup. Ct., 820, 46 L. Ed., 1132. See, also, on the general question our own case, *State*

v. *Union Railway Co.,* 129 Tenn., 705, 168 S. W., 575.
After having once passed on a vital question apper-
taining to the title claimed of a special tract of land,
the court would always be averse to reopening the
question where it had already had careful examination.
Such was the position assumed by the court a year or
two ago, when it was sought in an independent litiga-
tion to reopen the question as to the location of the
Indian boundary line ascertained in the case of *Hitch-
cock* v. *Southern Iron & Timber Co.,* supra.  Such in-
disposition of the court would be very greatly strength-
ened by the fact that the party seeking to reopen the
question had been a party to the former litigation
in which the point was settled.

It must therefore be held, as was held in the *McEwen
Case,* that the Church Lanier entry, No. 4271, depend-
ing for specialty on the Peter Yeates entry, through
the checkerboard system of entries, was not special;
hence the grant based on it could not relate to the
entry; therefore such grant is inferior to the prior
Barrell grants.

2.   Complainant claims under two Barrell grants,
Nos. 5090 and 5099.  The first of these closes its de-
scription with the words, "excluding all prior legal
claims," the second, with the words, "deducting all
legal prior claims."  It is insisted by defendant that
the Church Lanier entry, which it avers is a superior
claim to these grants, whether special or not, was sur-
veyed out by the county surveyor, and located on the
ground, and that it was therefore "a prior legal claim"

on April 25, 1837, when grants 5090 and 5099 were is-
sued, and that it is so excluded by the exclusion clause
in said grants.   The words quoted from these grants,
and similar words, have been uniformly held to exclude
only legal claims; that is, special entries, or grants.
*Bowman* v. *Bowman*, 3 Head (40 Tenn.), 48, 50; *Fow-
ler* v. *Nixon*, 7 Heisk. (54 Tenn.), 719, 723; *Bleidorn* v.
*Pilot Mountain Co.,* 5 Pick. (89 Tenn.), 211, 15 S. W.,
737; *Wright* v. *Hurst,* 122 Tenn., 656, 127 S. W., 701;
*Iron & Coal Co.* v. *Schwoon,* 124 Tenn., 176, 209, 135
S. W., 785.   There is no doubt possible as to the hold-
ing in the three last-cited cases, but it is said that in
*Bowman* v. *Bowman* a survey was recognized as such
prior legal claim.   This is a mistaken view.   It is true
the court speaks of the land thought by one of the
parties to have been excluded as ''land previously
granted, or held by prior legal surveys,'' having ref-
erence, by the last clause, it must be supposed, to sur-
veys made as required by law, of special entries, since
there was no warrant of law for the survey of a vague
or void entry.   The point is made clear by the follow-
ing language near the close of the opinion.

''The question is one exclusively between the State
and the grantee, with which a mere trespasser, or sub-
sequent enterer, has nothing to do,  . . .   and if the
State acquiesces, and allows the grant to stand, there
can be no question but that, in a court of law, it must
be regarded as investing the grantee with a legal title
to all the land included by its boundaries, not shown
to be held by a superior title.''

The relation of the survey to the entry, and of both to the grant, is shown in *King* v. *Coleman,* 98 Tenn., 561, 566-571, 40 S. W., 1082. And it was held in *Mc-Ewen's Case,* supra, that a survey without an entry, that is, without a special entry, was futile.

3. It is insisted that the complainant's predecessor in title, S. B. Barrell, should have filed a caveat, at the inception of his claim, since, as urged in the brief, the law at that time was that a subsequent enterer filed a caveat with the surveyor when he desired to procure a survey and grant of lands which had already been surveyed, when he claimed that the surveyor had located the previous entry improperly, or that the previous entry was not special, and in such case the surveyor summoned the previous enterer to appear at the next term of the county court, and litigate the right to the land, and that the effect of such caveat was to restrain the issuance of a grant to the prior enterer until the caveat proceeding had been decided.

The description thus given of the old action of caveat, while not inaccurate as far as it goes, yet is misleading, in the inference that such a proceeding was obligatory on one finding himself in the situation described. This proceeding was a simple one, and was begun and conducted in the manner shown in sections 16 and 17 of chapter 2, Acts of 1806; Whitney Land Laws of Tenn., pp. 125, 126, viz.:

"If any person shall obtain a survey of land to which another hath a claim, the person having such claim may enter a caveat to prevent his obtaining a

grant, until the claim can be determined; such caveat shall be entered within three months at farthest, after the receipt of the plat and certificate of survey, at the principal surveyor's office, expressing also, the nature of the right on which the plaintiff therein claims the land, and the quantity and part of said survey claimed, and shall take from the principal surveyor a certified copy thereof, which within thirty days thereafter, he shall deliver to the clerk of the court of the county in which the land, or any part thereof lies, and shall more-over, take from the principal surveyor a certified copy of the survey and plat, which, within thirty days from entering such caveat, he shall in like manner deliver to the clerk of the court where the suit shall be tried; and in case of failure in either instance the caveat shall be void.''

''The clerk of such court on receiving the same, shall enter such copy of the caveat in a book to be kept by him for that purpose, and shall thereupon issue a sum mons directed to the sheriff of any county where the defendant may reside, reciting the cause for which such caveat is entered, and requiring the defendant to appear on the first day of the next succeeding county court, and defend his right; and on such process being returned, executed on the defendant, his agent or at-torney, the court shall proceed to determine the right of the cause in a summary way, without pleadings in writing, by impaneling and swearing a jury for the finding such facts as are material to the cause, and are not agreed by the parties, and shall thereupon give

judgment; a copy of which judgment, if in favor of the defendant, being delivered into the office of the principal surveyor within thirty days thereafter, shall vacate the said caveat; and if the said judgment be in favor of the plaintiff, upon delivering the same into the office of the principal surveyor within sixty days thereafter, he shall be entitled to a plat and certificate as in other cases; and in any caveat where judgment shall be given for the defendant, the court shall award him his costs, and may compel the plaintiff in any caveat, if they think fit, to give security for costs, or on failure thereof may dismiss the suit; and in case the plaintiff in any caveat shall recover, the court shall award costs against the defendant."

By chapter 22, Acts of 1825, leave was given to file the caveat in the circuit court as well as the county court. Section 2 of that act reads:

"In all cases of interference between entries made under the provisions of the aforesaid act, and between such entries and any older entries or grants made and issued under the laws of this State, either party shall have [the] liberty of filing a caveat thereto, as heretofore, subject to the same rules and regulations, and to be proceeded on and determined in the same way in which similar proceedings are decided and acted on, under existing laws in regard to caveats; and caveats may hereafter be filed either in the county or circuit courts."

Apparently the original purpose of the section quoted was to settle contests merely between conflicting en-

tries; but by construction the action grew into a means of trying title to land, or rather both title and equitable right, and in practice it was treated as the equivalent of a bill in equity. *Peck* v. *Eddington,* 2 Tenn. (2 Overt.), 331; *Gould* v. *Hoyle,* 3 Hayw. (4 Tenn.), 100; *Bugg* v. *Norris' Lessee,* 4 Yerg. (12 Tenn.), 326; *Peeler* v. *Norris,* 4 Yerg. (12 Tenn.), 331. In *Peck* v. *Eddington,* the controversy turned on the validity of an arbitration. In *Heirs, etc., of Williamson* v. *Buchanan,* 2 Tenn. (2 Overt.), 278, it was instituted by one claiming under a grant, for the purpose of preventing another from obtaining a grant to the same land. In *Gould* v. *Hoyle,* supra, the subject of contest in this proceeding was a pre-emption right. *McGavock* v. *Shannon,* 5 Yerg. (13 Tenn.), 128 and *Vaughn* v. *Hatfield,* 5 Yerg. (13 Tenn.), 236, were typical contests between conflicting entries. In *Williams* v. *Wilson,* Mart. & Y. (8 Tenn.), 248, the caveat was filed by one who claimed that he was the owner of the land by grant from the State, and charged that notwithstanding this fact another had entered the same land, and would, unless restrained, obtain a grant thereon. The purpose was to assert the caveator's title, and prevent the creating of a cloud thereon. It is obvious that all of the uses of the ancient caveat would now be served by a bill in equity drawn according to our modern practice. The advantages of the caveat were its adaptability to the times in which it was used, the pleadings being informal, and all of the equities arising out of the facts being considered and determined without regard to technical forms of

presentation, and the case, at first, being instituted in the nearest and the simplest tribunal, the county court. It was gradually developed by construction, as shown in *Bugg* v. *Norris,* supra, and *Peeler* v. *Norris,* supra. It probably was originated in analogy to the caveat proceeding in the ecclesiastical court of England to prevent the granting of administration pending the contest of a will. 4 Bac. Abridg., 51, 52. It never was obligatory or exclusive. It has no application to the present controversy. It has been long recognized, in cases too numerous to mention, that if there be two grants to land, the oldest grant must be treated as having conveyed the State's title, unless the younger grant be based on a special entry antedating such prior grant, in which latter case the younger grant will relate to the entry, and convey the title. It has further been equally well recognized that the question of title to the land under such a state of facts may be tried in ejectment without reference to any prior caveat proceedings.

4. As to the defense of adverse possession. There is much conflict in the evidence on this subject, but after carefully weighing all of it, we find the following facts proven: On December 13, 1904, defendant completed a house on the interlap between its McEwen grant 7982 and complainants' Barrell grant 5099, and put a tenant in charge of it who placed some of his goods in the house and occupied it two nights in the week, and when he was absent he left the door locked. This state of things continued up to the bringing of

the present suit, more than seven years, and has since continued, the tenant claiming for the defendant under a lease covering the whole of the interlap.  On the 14th of December, 1904, the complainant having previously placed some lumber on the land for the purpose, proceeded to build upon the same interlap, at a point one-half a mile distant from defendant's structure, a house likewise.  Some goods were placed in this house, and it was then closed and locked, with a chain and padlock, the lock having two keys, one kept by complainant's agent Jackson Tate, and the other by its chief agent, A. R. McKenzie, under whose orders Jackson Tate was acting.  From time to time, usually twice a month, Jackson Tate visited the place to see that the premises had not been disturbed, and also to keep the leaves swept away so as to protect the house from forest fires.  This state of matters in respect of the complainants' house continued until the fall of 1907, when some unknown person broke the chain, and thereupon defendant's tenant and agent, Tim Tate, seeing the door open, put a new chain on the door, and locked it, thus taking possession of this house for the defendant.  It does not appear from the evidence whether the goods left in the house still remained at the time last mentioned, but we assume they had been removed by the person who broke the lock.  After Tim Tate thus took possession of the house for defendant he continued to hold it, up to the time it was burned during the year 1908.  This action was brought February 20, 1913.  At that time Tim Tate had been in possession of

defendant's house on the interlap eight years six months and seven days. But complainants had, during two years and about nine months of this period, been in possession of their house on the interlap. So, if this created a concurrent possession, defendant's exclusive adverse holding was reduced to less than seven years before action brought; that is, to five years and nine months.

Was complainants' possession of the interlap concurrent with defendant's during the two years and nine months? In our opinion it was. It is true that defendant went first into actual possession of the interlap, and therefore could have instituted proceedings in unlawful entry and detainer against complainants and had them removed from the land, although complainants were the owners of the superior title resting on the interlap. Not pursuing this remedy, defendant must be held to have acquiesced in complainants' possession of the house in question for the two years and nine months, and there was a true concurrent possession for that period. Complainants having the title, this drew to them the possession of all of the land covered by their grant, except that part of it covered by defendant's inclosure, that is the defendant's house and the ground covered by it.

The foregoing principles are recognized and approved in *Norvell* v. *Gray,* 1 Swan (31 Tenn.), 96, 107, 108, *Waddle* v. *Stuart,* 4 Sneed (36 Tenn.), 535, and *Creech* v. *Jones,* 5 Sneed (37 Tenn.), 632. In the first of these cases it is said:

"But, in holding that an entry, as a remedy to regain seisin of an estate, by the mere act of the party, cannot have the effect, under the act of 1819, as at common law, we are not to be understood as intimating that an entry, by the rightful owner, upon lands adversely held, within seven years, if acquiesced in, will have no legal effect. Upon general principles we think it may have the effect to give such owner a legal seisin, at least to such part of the land as he may be able to acquire the peaceable and exclusive possession of; and as against a wrongful possessor—although he may be in under an invalid or inferior assurance, purporting to convey an estate in fee simple—we incline to the opinion that possibly such entry would give the owner seisin, as far forth as the wrongful possessor had not actual possession. Both having an actual possession and occupation of different parts of the same tract, and each claiming an exclusive right, the one under a valid and the other under an invalid title, which shall be regarded as having the possession of such part of the tract as may not be actually occupied by either? Will not the law, in such case, as in other cases of a mixed or concurrent possession, adjudge the seisin to be according to the title, as far as there exists no actual adverse possession? But in the case put, it is clear that as such entry of the legal owner would be no ouster of the actual possession of the wrongdoer, it could not have the effect to neutralize such adverse possession, or to suspend the operation of the statute of limitations,

as to the part actually occupied by the wrongful possessor.''

In *Creech* v. *Jones* it is said:

''But it is argued for the plaintiff in error that an entry upon the land covered by both grants, by the party having the elder and better title, within the period of seven years from the commencement of the adverse possession under the younger grant; will have the effect to neutralize such adverse possession and arrest the running of the statute of limitations.

''We are not prepared to assent to the correctness of this proposition in its full extent. We are of the opinion, as stated in *Norvell* v. *Gray's Lessee,* 1 Swan, 96, 107, that a peaceable entry, in such case, by the rightful owner, would give him a legal seisin of all the land within the interference of which the younger grantee, or wrongful possessor had not previously acquired the actual possession by inclosure, or other erections. But such entry would be no ouster of the actual possession of the wrongdoer, and could not therefore have the effect to neutralize the adverse possession, or to suspend the running of the statute, as to the part of the land actually occupied by the wrongdoer. This effect, under the statute, could only be produced by a suit at law or in equity, effectually prosecuted. As far, however, as there was no actual adverse possession, the law would adjudge the possession to be in the party having the title; both parties having actual possession.''

It is certainly true, as clearly expressed in the cases cited, that the owner entering could not be permitted, in the interest of the peace and good order of society, to disturb the parts of the land on which the trespasser had located his actual possession; but if he can peaceably make an entry on some other part of the land without a breach of the peace, he may do so. But, as previously intimated, inasmuch as the trespasser entering under color of title, and establishing an actual possession, has constructive possession to the extent of the boundaries of his color, he may remove the owner coming later by proceedings in unlawful entry and detainer, and so force him to his action of ejectment. If such action of unlawful entry and detainer be commenced within a reasonable time and prosecuted to a successful conclusion, the period of occupation so terminated cannot be counted as an interruption of the possession, but otherwise if the party be permitted to remain without such expulsion.

5. As to outstanding title. Defendant offered in the chancery court, on the hearing of the cause, a certified copy of a deed made by S. B. Barrell on the 21st of February, 1849, to William A. Bradley, conveying the lands described in grant No. 5993, covering a part of the land in controversy in the present case. On objection made by complainants the chancellor excluded the deed on the ground that this deed "had not been filed in the office of the clerk and master previous

to the trial, and because the filing of the deed had not been waived by the complainant.'' This was error.

Our chancery rules (Shan. Code, p. 1777 et seq.) do not reach the question, nor do our Code provisions on the subject of chancery practice. Id., sections 6271-6281. We are remitted, therefore, to the old rules of English chancery practice. By these rules, while four days' notice, by the service of an order for the purpose, was required for the introduction of oral evidence at the hearing of exhibits in order to prevent surprise, no notice was required of the introduction of documents which proved themselves, by official certificates, as deeds or the like. In New York chancery practice, Chancellor Kent changed the four days' notice into simply a reasonable notice, to be judged of by the court according to the circumstances of each offer to prove exhibits. Subsequently the seventy-fifth chancery rule of that State changed the time to ten days. However, as we understand the cases, no change was made in the general rule of chancery practice that no notice need be given of the filing of documentary evidence that needs not to be supported by oral evidence at the hearing; and that rule was so construed as to permit the same liberty in respect of exhibits sufficiently described in the pleadings to put the opposite party on notice. We refer to the following cases in the New York Chancery Reports which refer to and discuss the English authorities, the seventy-fifth New York chancery rule, and the application of each: *Pardee* v. *De Cala*, 7 Paige, 132, 4 N. Y. Ch., 95; *Kellogg*

v. *Wood,* 4 Paige, 578, 607, 608, 3 N. Y. Ch., 568, 580; *Barrow* v. *Rhinelander,* 1 Johns. Ch., 550, 560, 1 N. Y. Ch., 242, 245; *Consequa* v. *Fanning,* 2 Johns. Ch., 481, 482-484, 1 N. Y. Ch., 457. The case of *Miller* v. *Avery,* 2 Barb. Ch., 582, 5 N. Y. Ch., 762, on the subject in hand was evidently decided under rule 75, previously referred to, which was introduced in 1830, or about that time, as appears from the text of *Pardee* v. *De Cala;* supra. That rule does not apply in this State, and therefore the authority is not applicable.

The deed from Barrell to Bradley was sent up as part of the record, so that the court might correct the error of the chancellor if it should deem there was error in his ruling. So, doing what the chancellor should have done, we find that Samuel B. Barrell, complainants' predecessor in title, conveyed to William A. Bradley, on the 21st day of February, 1849, all of the lands described in Barrell grant No. 5993, and the title to that land is outstanding, in the said Bradley, his heirs, or assigns. It follows that complainants cannot recover any of the land sued for which is covered by the grant last mentioned.

It results that the decree of the chancellor must be modified in the respect last mentioned, but in all other things will be affirmed.

The costs of this court, and of the court below, will be paid in the following proportions, viz.: One-tenth by complainants, and nine-tenths by defendant.

Questions raised in the case and not mentioned in the opinion were disposed of orally.